**USH VENTURES, a California Corporation, and USH Telecom, L.L.C., a Delaware Limited Liability Company, Plaintiffs,**

v.

**GLOBAL TELESYSTEMS GROUP, INC., a Delaware Corporation, GTS Hungaro, Inc., a Delaware Corporation, and GTS Hungary Telecom, Ltd., a Hungarian Company, Defendants.**

**C.A.No. 97C–08–086WTQ.**

Superior Court of Delaware,
New Castle County.

May 9, 2000.

---

**17.** 561 N.E.2d 18.

**18.** *Id.* at 22.

**19.** *Zenkina,* 922 P.2d at 176.

David L. Finger, Esquire, Wilmington, Delaware, Attorney for Plaintiffs.

John A. Parkins, Jr., Esquire, and Jeffrey L. Moyer, Esquire, Richards, Layton & Finger, Wilmington, Attorneys for Defendants.

## OPINION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### *MOTION GRANTED*

### *VARIOUS OTHER MOTIONS RENDERED MOOT*

QUILLEN, J.

This is the Court's Opinion and Order on Plaintiffs' and Defendants' respective

Motions for Summary Judgment. For the reasons stated herein, the Defendants'· Motion for Summary Judgment is GRANTED because the Plaintiffs have not provided expert testimony or proved that they could have obtained the investors necessary to fulfill the contract. The *Motion* is also GRANTED because there is no evidence that GTS pursued the "specific application" listed in Schedule B of the non-disclosure/non-compete agreement. By virtue of this ruling, the Plaintiffs' Motion for Summary Judgment as to the Defendants' affirmative defenses of misrepresentation, fraud, equitable fraud, duty to investigate, mutual mistake, failure of consideration and standing is rendered moot.

### FACTS

This case arises out of an attempt to create a telecommunications system in Hungary. The Plaintiffs seek damages from an alleged breach of a non-disclosure/non-compete agreement.

Dr. Leslie Jacob began to explore business opportunities in his native Hungary beginning in 1990. He recognized that there was a need for a wireless communications network, and he learned that the Hungarian Water Management Authority ("OVF")[1] was interested in enlarging its telecommunications network. Dr. Jacob formed a company to pursue the wireless communications systems which he named USH Ventures ("USHV").

Apparently, after Jacob meet with some Hungarian government officials, the Hungarian government through OVF formed a for-profit corporation which was named the Hydrotel Telecommunications Company ("Hydrotel"). Hydrotel then began soliciting funding to develop the telecommunications project. This invitational tender appeared to also encompass the right to build and develop the communications network.

Dr. Jacob was interested in getting into this communications project. USHV, acting through Dr. Jacob, put together a consortium consisting of itself, Vanguard Telecommunications, Incorporated ("Vanguard"), and California Microwave, Incorporated in order to submit a proposal to provide the funding on the Hungarian communications project. After the bids were counted, this three-way consortium had the winning tender for the project with the Hungarian authorities. It appears that the USHV consortium's tender was the only tender of merit submitted to the Hungarian officials. Varga Dep. at 13, Dkt. No. 149. In April 1995, the consortium signed an agreement with Hydrotel to be the main developer of the project. That agreement had certain conditions precedent to formation. That agreement stated in pertinent part:

> The conditions of the present Agreement to come to full force and effect are as follows:
>
> a) that it has been approved by the respective Board of Directors of each Investor, and such approval has been verified through the representative of the Company in writing.
>
> b) that the Investors establish the Strategic Investor and verify its existence in the Company,
>
> c) that the Members' Meeting of the Company accepted and approved this agreement and passed a resolution for the first Capital Increase in accordance with the provisions of Par. 6. of this Agreement....
>
> If the actions outlined in points a) to c) do not take place within 90 days from the date of signing this Agreement, the

---

1. It appears that OVF was the successor entity for an organization called "ABKSz."

present Agreement shall not take effect and the Parties are freed of all obligations undertaken in this Agreement and have no claims whatsoever against each other. The Parties may extend the deadline for the Agreement gaining full force and effect by mutual consent in writing.

Tender Contract Agreement at 10–11, Dkt. No. 136.

Obtaining the funding for the project seemed to be going well at the beginning. In May 1995, Hydrotel secured a grant from the U.S. Trade and Development Agency in the amount of $381,000US to fund the cost of services required for a feasibility study on the telecommunications project. On September 27, 1995, in furtherance of the project, the members of the consortium established USH Telecom, LLC ("USHT") to acquire, own, hold, and dispose of the Hydrotel project and exercise and execute all rights and obligations attributable to it. *USH Ventures v. Global Telesystems Group, Inc.,* Del.Super., 97C–08–086, Quillen, J. (June 9, 1999), Letter Op. at 2.

The September 27, 1995 Limited Liability Company agreement between the consortium members also contained certain conditions precedent to formation. The LLC agreement states:

This agreement shall not become effective until the occurrence of the following events:

(i) the execution of loan documents by the Company establishing a credit facility with the Senior Lender in an amount and on the same or substantially similar terms as those set forth in that certain letter of interest dated September 14, 1995 from U.S. Export–Import Bank to US/H Ventures;

(ii) the ratification and adoption of this Agreement by the Board of Directors of each of US/H Ventures, Vanguard and California Microwave; and

(iii) the ratification and adoption by the Company, upon the unanimous vote of the Members, of the Hydrotel Agreement, including such revisions, clarifications and modifications as are acceptable to, and in form and substance otherwise acceptable to, each of the Members.

LLC Agreement at 31, Dkt. No.149.

While the project at the beginning seemed to be on track, the financing necessary for the project did not come through like the parties had wished. The consortium did not meet the 90–day deadline to satisfy the conditions precedent in the tender contract agreement with Hydrotel and the Hungarian authorities. A strategic investor was never identified and it does not appear that the Boards of all three of the consortium members ratified the agreement within the 90–day period to satisfy the conditions precedent. The consortium members were granted a written extension by the Hungarian representative to fulfill the conditions precedent in the Hydrotel contract. This extension gave Vanguard the exclusive right until February 28, 1996 to solicit potential investment in the Hydrotel project. That extension was given in exchange for a $100,000 capital contribution by Vanguard to the Hungarian authorities. Vanguard 12/15/95 Letter of Intent, Dkt. No. 136, Ex. 19. Vanguard claims that it pledged the $100,000 "to give us the opportunity to make something out of what we perceived to be very little or nothing" so that "somebody else ... would be able to make an equity investment into this." A. Whiting, Dep. at 31, Dkt. No. 135, Ex. 6. The financing never did materialize and the conditions precedent to the original written Hydrotel/USHT contract were never fulfilled. By March 1996, the

parties understood that the extension expired and the original agreement with the Hungarian authorities was no longer in effect. Thereafter, Vanguard decided to reduce the level of its involvement with the project.[2]

While it is clear that the contract had expired, USHT through Jacob now claims that it was given an oral first right of refusal contract from Hydrotel so that USHT could participate in financing the Hydrotel telecommunication project. Such an oral contract appears to be valid under Hungarian law.

Armed with only this alleged oral first right of refusal contract, USHT started to again search for investors for the project. Dr. Jacob did not want to let the project die. He began negotiations with United International Holdings ("UIH") to obtain funding. UIH raised the idea of bringing in Global Telesystems Group, Incorporated ("GTS"), with whom UIH was in negotiations on other strategic business alliances. After some initial discussions, UIH[3], GTS[4] and USHT[5] signed a mutual non-disclosure and non-compete agreement so each could deal with each other candidly on the Hungarian project. The agreement stated in pertinent part:

> The Parties recognize that both GTS and USH have developed business plans around two different specific applications. These two applications are each described on Schedules A and B respectively. In order to evaluate the mutual benefit of combining these two applications and developing a single communications network to support the applications and other commercial opportunities, the Parties agree (i) that, for a period of 24 months after the date hereof and (ii) without the parties written agreement:
>
> (a) Neither GTS or USH shall pursue the other party's application (for USH this shall mean the specific application being developed by GTS as described on Schedule A; for GTS this shall mean the specific application described by USH on Schedule B) for a period of 24 months from the date of this Agreement . . .

Jacob alleges that he then turned over certain materials which were reviewed by GTS. Dr. Jacob claims that while he was

---

**2.** A memo written by Jacob dated March 28, 1996 sent to Van E. Snowdon of Vanguard International illustrates that Jacob knew that the February 29, 1996 extension had expired and the agreement was no longer in effect. That letter stated:

> I don't have to remind you that the winning tender is no longer in effect. We were sitting side by side on February 28, when Dr. Varga told us that as far as ABKSZ is concerned all extensions expired on February 29, 1996. All he agreed to was that he will not directly solicit prospective partners through March 31, but he will not refuse to talk to a third party if he is approached. He has been approached and he is talking, actually to three suitors, none of them companies solicited by IPAC, BZW or USH ventures. Right now, unless credible evidence

can be produced to Dr. Varga in the early days of April that a deal is in hand, we can all forget about getting our respective investments returned, let alone to make a substantial profit, as Vanguard seems to want to do.

Jacob March 28, 1996 Letter, Dkt. No. 148, (A–95). *See* n.6 *infra*.

**3.** The UIH representative who signed the agreement was Vernon Kenley, then the executive vice president of UIH.

**4.** The representative who signed the agreement on behalf of GTS Hungary was Louis Toth, the vice president for GTS Central Europe.

**5.** Dr. Jacob signed the agreement on behalf of USHV, who signed the USHT.

trying to get financing with and through GTS, he had received oral assurances by Dr. Milos Varga[6] that, so long as he and USHT were working in good faith toward getting the Hydrotel project done, that OVF would not seek additional investors for the communications project.

Plaintiffs argue that after the non-disclosure/non-compete agreement was signed with GTS, Istvan Pesti of GTS Hungary Telecom, Ltd. approached Dr. Varga and stated that GTS would be willing to implement a development project in Hungary. Varga Dep. at 27, Dkt. No. 135, Ex. 5. Plaintiffs argue that GTS Europe (through Pesti) and OVF (through Varga) initiated secret negotiations to take control of Hydrotel. On July 26, 1996, GTS and OVF signed a confidentiality and non-disclosure agreement with each other. Dkt. No. 136, Ex. 25. In that agreement, OVF agreed to provide confidential business information to GTS about the Hydrotel project. On December 16, 1996, GTS Hungaro, Inc., which is a holding company that is a subsidiary of GTS, signed a contract with OVF giving GTS Hungaro voting and management control over Hydrotel. Dkt. No. 136, Ex. 31. In this agreement, OVF states that it would agree to vote together with GTS in any corporate meeting of Hydrotel on an array of issues following a capital raise. *Id.* at 2. This agreement effectively squeezed USHT from the project and gave GTS control of frequencies, licenses, and infrastructure of Hydrotel for the communications project. *See* ITC Report, Dkt. No. 136, Ex. 32.

GTS Hungaro eventually determined that the telecommunications network was not feasible and the telecommunications network was not built. USHV claims that as a result of the violation of its agreement with GTS, it was shut out of the Hydrotel project and denied a valuable opportunity to participate in the Hungarian market.

USHV and USHT have filed suit in this Court, seeking recovery of damages stemming from the alleged breach of non-disclosure/non-compete agreement it signed with GTS. The parties have filed several Motions for Summary Judgment and other Motions in an attempt to clarify and/or narrow several issues prior to trial. The Court is satisfied that a global Motion for Summary Judgment by the Defendants should be GRANTED and this determination makes all other pending Motions moot.

### STANDARD OF REVIEW

When considering a Motion for Summary Judgment, the Court's function is to examine the record to determine whether genuine issues of material fact exist. *Oliver B. Cannon & Sons, Inc. v. Dorr–Oliver, Inc.,* Del.Super., 312 A.2d 322, 325 (1973). If, after viewing the record in a light most favorable to the non-moving party, the Court finds that there are no genuine issues of material fact, Summary Judgment will be appropriate. *Id.* Summary Judgment will not be granted if the record indicates that a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances. *Ebersole v. Lowengrub,* Del.Supr., 4 Storey 463, 180 A.2d 467 (1962).

### PRELIMINARY DIGRESSION

Preliminarily, I note that the Court and the parties in this case have discussed whether this Judge should be appointed as

---

6. Dr. Varga is the Hungarian Minister of Telecommunications, Traffic and Water Management.

a temporary Vice Chancellor so that certain equitable defenses can be raised without jurisdictional challenges. Questions of this nature continue to arise on occasion and then tend to get buried as the case proceeds on the merits in one Court or the other. Normally the question itself is unnecessary. In particular, even if the ultimate decision in this Opinion were different, such appointment does not appear to be necessary for a Superior Court Judge to decide all the immediate questions presented in this case.[7] It seems further desirable to say that equitable defenses generally, a long time ago, worked their way into purely legal cases. Dan B. Dobbs, *Remedies*, 44 (1973). Delaware has, however, generally failed to document, in any comprehensive fashion, the welcomed invasion. So, before another case slips into oblivion or takes other tacks, it seems wise to address the jurisdiction, albeit by way of free-wheeling dicta.

Unfortunately, time schedules in this Court interfere with any Judge in a single case opining a judicial treatise on the subject of law and equity. I certainly do not want to rest anything finally on the ramblings of this hastily written preliminary digression, which is at best a long way from maturity as a legal study. But, since the issue comes up sporadically and lip service is often muttered to old cliches, clearly the subject needs fresh review in the Twenty-First Century and particularly so when a State chooses to maintain a bifurcated system as a desirable but nonetheless complicating factor.

First, I note some general thoughts. Douglas Laycock is among the few giving reflective thought to this ancient subject and a 1993 article, *The Triumph of Equity*, 56 Law & Contemp. Probs. 53 (herinafter

"Laycock at ___") gives some of his thoughts in a capsule format. While he writes as an integrationist, his thoughts have profound implications in a bifurcated State as well. One purpose of his writing is to move us beyond antiquity so that jurisdictional concepts are designed to service future needs and not to perpetuate old concepts that have no practical use in today's world.

Laycock challenges the traditional analytical paradigm that equity jurisdiction depends on irreparable injury or on the absence of an adequate remedy at law. Obviously, to a great extent, Delaware is stuck with this paradigm as part of our view of Constitutional equity as that Constitutional principle is declared in our statute. *See* 10 *Del. C.* § 342, *Glanding v. Indus. Trust Co.*, Del.Supr., 45 A.2d 553 (1945); *DuPont v. DuPont*, Del.Supr., 85 A.2d 724 (1951); *see also*, William T. Quillen, *Constitutional Equity and the Innovative Tradition*, 56 Law & Contemp. Probs. 53 (1993).

But the truth is that we too have probably switched the burden on jurisdiction by our own definition of adequate remedy, or sufficient remedy to use the statutory term. Irreparable harm only means harm that cannot be repaired at law; it does not mean catastrophic injury. *State v. Delaware State Educational Ass'n*, Del. Ch., 326 A.2d 868, 875 (1974). The jurisdiction in equity does not depend on the need for a remedy that is extraordinary, as that term is commonly used in the English language. To the contrary, for the remedy at law to prevail, the remedy at law must be: available as a matter of right (*In re Wife, K.*, Del. Ch., 297 A.2d 424 (1972)); full, fair and complete

---

7. The two main equitable defenses the parties wish to assert in this case are equitable estop-

pel and ratification.

(*Hughes Tool Co. v. Fawcett Publications, Inc.*, Del.Supr., 315 A.2d 577 (1974)); and as practical and efficient to the ends of justice as the equitable remedy (*DuPont*). This is a very practical standard which favors equity in cases where the Plaintiff for good reason seeks relief other than money damage. Laycock suggests the only cases where the adequacy of the remedy at law is the decisive factor in denying equitable jurisdiction are cases involving fungible goods and routine services, and the first group is itself subject to equitable considerations. As Laycock says, "[t]here is no remedial hierarchy." Laycock at 62. Remedies are not extraordinary or ordinary; they are choices to solve problems.

Surely we need to desert the whole idea of hierarchy between law and equity. It certainly makes no sense to pay tribute to the concept of "inferior Courts of Chancery." Constitution of 1776, Art. 13. Nor does it make any sense to me in the year 2000 for a modern Chancellor to describe his or her Court, perhaps the most important State Trial Court in the country, as one of limited jurisdiction because of the irreparable injury rule. *Harman v. Masoneilan Int'l Inc.*, Del. Ch., 418 A.2d 1004, 1007 (1980); *rev'd on other grounds*, Del. Supr., 442 A.2d 487 (1982).[8] On the other hand, the Superior Court should not bear any inferior status *vis-a-vis* equity because Chancellor Ellesmere triumphed over Chief Justice Coke in 1619. The day when our Court of Chancery enjoins or overrules enforcement of law judgments is long gone.

The difference between law and equity remains pretty clear-cut. Law has a criminal side, equity does not. Generally, on the civil side, law litigates money damage suits (substitutional relief) and equity litigates suits where the Plaintiff wants something instead of money (relief in specie) or something in addition to money. This simple distinction probably takes care of over ninety-five percent of the non-statutory jurisdictional divide.

Some things on the fringe do not make jurisdictional common sense. As a jurisdictional matter, why is ejectment brought at law and a bill to quiet title brought in equity? Why should that litigation over legal title depend on whether the Plaintiff is in possession? As a philosophical matter, why should specific performance be denied for unclean hands and yet at least lip service be paid to the principle that the dirty Plaintiff can recover damages at law? To take another analytical step in legal theory, why should substitutional damages at law not fully compensate the Plaintiff to the same extent as specific performance would in equity? Chancellor Kent said "equity will not enforce hard, or unreasonable, or unequal bargains, but rather leave them to a jury at law, to mitigate or apportion the damages, as the justice of the case shall appear ...." *Seymour v. Delancy*, N.Y. Ch., 6 Johns. Ch. Reports 222 (1822), *rev'd*, N.Y. Court for Trial of Impeachments and Correction of Errors, 3 Cowen 445 (1824). Is the great American Chancellor endorsing a form of jury nullification by counting on the jury to award legally inadequate damages?

These questions present some challenge. Change should come carefully. We should make jurisdictional adjustments for practical reasons as we did when we moved stock lists and records cases to Chancery from their former mandamus status. Less clear to me, but certainly in the same spirit, is transfer of settlement of minors' tort cases to Superior Court from Chan-

---

8. My own preferred description for the Court of Chancery (at least currently) is a Court of general equity jurisdiction. I join Chancellor Marvel in disdain for the slang mislabel "Chancery Court;" it, too, suggests an undeserved inferior status.

cery. We all know that there would be little justification for the continued bifurcation of our Courts were it not for the corporate law and the tradition of wisdom in corporate litigation by Chancellors Curtis, Wolcott, and Seitz, a tradition being continued by today's outstanding Chancellor and Vice Chancellors. The justification has merit for a simple reason; it works. But jurisdictional change will undoubtedly continue, hopefully on a practical basis, and not be burdened by outmoded jurisdictional concepts.

But it seems to me that it ought to be a given that the basic underlying principles of justice now exist at law as well as in equity. Moreover, I think at least most do. Equitable doctrines have been absorbed by law both by statute and by Courts of common law, themselves dynamic and evolving institutions. Indeed, except for the law of trusts, substantive equity has generally been incorporated into law. Assignees can sue on contracts;[9] recording recognizes equitable servitudes;[10] the law of mortgages is largely statutory.[11] "The use of the term 'equitable principles' . . . is merely equivalent to the words 'principles of fairness or justice.' [The Court of Chancery] does not hold a monopoly on deciding cases based on 'equitable principles.'" *Clark v. Teeven Holding Co., Inc.*, Del. Ch., 625 A.2d 869, 878 (1992). It is in this context that we should look specifically at so-called equitable defenses.

The Delaware Constitution of 1897, in describing the jurisdiction of the Superior Court, states:

> The Superior Court shall have jurisdiction of all causes of a civil nature, real, personal and mixed, at common law and all the other jurisdiction and powers vested by the laws of this State in the formerly existing Superior Court; and also shall have all the jurisdiction and powers vested by the laws of this State in the formerly existing Court of General Sessions of the Peace and Jail Delivery; and also shall have all the jurisdiction and powers vested by the laws of this State in the formerly existing Court of General Sessions; and also shall have all the jurisdiction and powers vested by the laws of this State in the formerly existing Court of Oyer and Terminer.

Del. Const. art. IV § 7. For good reason, we commonly call the Superior Court our Trial Court of general jurisdiction. The jurisdiction of the Superior Court is not limited to the constitutional grant conferred in Section 7. *State v. Dobies*, Del.Super., 290 A.2d 663, 666 (1972). Article IV, Section 17 provides for "Jurisdictional changes by the General Assembly" and the General Assembly is specifically granted the "power to confer upon the Superior Court . . . jurisdiction and powers in addition to those hereinbefore mentioned . . ." *Id.* (citing Del. Const. art. IV § 8, 17). And, under 10 *Del. C.* § 542(c), the Superior Court is given the authority

---

9. As noted above, a lawsuit by an assignee of a contract was formerly an equitable procedure, but Courts of law adopted the principle that assignment of contract rights should be protected, which made application to the Court of Chancery unnecessary, and, some time afterward, equity would no longer take jurisdiction to enforce the right of payment. *See* Samuel Williston, *Williston on Contracts*, § 410 (3d ed.1960), *see also, Hayward v. Andrews*, 106 U.S. 672, 678–79, 1 S.Ct. 544, 27 L.Ed. 271 (1883); William F. Walsh, *A Treatise on Equity*, 91 (1930).

10. This doctrine is most notably memorialized in the old equity case of *Tulk v. Moxley*, 2 Phillips 774, 41 Eng. Rep. 1143 (Ch. 1848) which used to be a law school staple.

11. *But see Handler Construction, Inc. v. CoreStates Bank*, Del.Supr., 633 A.2d 356 (1993).

to "minister justice to all persons ...according to law and equity." While the Supreme Court has recognized that this section of the Delaware Code should not be interpreted as merging law into equity because there is a historical and constitutional separation between law and equity in this State (*see Monroe Park v. Metropolitan Life Ins. Co.*, Del.Supr., 457 A.2d 734, 738 (1983)), it appears that the historical trend was and is to allow equitable defenses to be heard at law and equitable defenses are commonly allowed in Superior Court today.

The primary character of equity persists as the compliment of legal jurisdiction. 27A Am.Jur.2d, *Equity*, § 3 (1996). But the issue between the law and equity Courts, with respect to the line which separates their jurisdictions, has never been completely settled; and perhaps will necessarily continue until the two jurisdictions are blended together or are administered by the same Judges in the same proceeding. 1 John M. Pomeroy, *Equity Jurisprudence*, § 39 (5th ed.1941) (hereinafter *Pomeroy's Equity Jurisprudence* ). The separation of law and equity arose originally from the blind conservatism of common law Judges who stubbornly resisted any change in the spirit or form of the law that had been established by precedent. *Id.* at § 16, *see also*, William Q. deFuniak, *Handbook of Modern Equity*, 5 (2d ed.1950). Since the earlier and more arbitrary condition of the law, the law, including by progressive legislation governing Courts, has gradually adopted and incorporated into its jurisprudence a multitude of doctrines and rules which were originally purely equitable. 1 *Pomeroy's Equity Jurisprudence* at § 182.[12]

The primary purpose of equitable defenses is to establish a defense to an action at law. *See* William F. Walsh, *A Treatise on Equity*, 99–100 (1930). By judicial innovation in the Nineteenth Century, the jurisdiction of common law Courts was greatly extended to allow equitable defenses to actions at law on formal contracts. *See generally*, James B. Ames, *Specialty Contracts and Equitable Defenses*, 9 Harv. L.Rev. 49, 58 (1896). Common law Courts consciously adopted and applied purely equitable notions. 1 *Pomeroy's Equity Jurisprudence* at § 69. This trend of the law Courts adopting equitable doctrines was accelerated legislatively in 1800s. Reform and simplification of the legal procedure in this country and in England resulted in the abolishment of the formal distinctions between law and equity in many States by statute. Henry L. McClintock, *Principles of Equity*, 13 (2d ed.1948). Twenty-two States and territories adopted codes of practice which in terms abolished the distinctions between actions at law and suits in equity between 1848 and 1887. Sidney Post Simpson, *Fifty Years of American Equity*, 50 Harv. L.Rev. 171, 179–180 (1936).[13] In fact, one of the outstanding purposes of merging law and equity into a

---

12. In fairness, it does not appear that Pomeroy would support the adoption of equitable defenses in every case without a statutory authorization to do so. *Pomeroy's Equity Jurisprudence* at § 1367–70. But the changing and developing nature of the law must encompass the common law Court's ability to accept new precepts, as the common law Courts of England did under Lord Mansfield. *See id.* at § 69.

13. That movement slowed down considerably because only four jurisdictions abolished the distinctions between 1887 and 1933, when the movement was revived. *Id.* at 180. The authorization for the Superior Court to "minister justice ... according to law and equity" dates from at least 1852; Code 1852 § 1918. It appears that this statute was enacted at the same time as many other States were merging their Courts of law and equity. In any event, the statute gives legislative sanction to the adoption of equitable defenses by law Courts.

single Court was to do away with the preposterous practice of maintaining an additional suit in equity in order to establish a defense to an action at law. Walsh, *A Treatise on Equity*, at 100. As we know, most States merged the law and equity Courts by statute. Thus, equitable defenses are now generally available at law and in equity. Laycock at 69.

Adoption of equitable doctrines into the law has happened for centuries. Fraud, illegality, failure of consideration, payment, discharge of surety, accommodation, and duress[14] all began as equitable defenses and were subsequently recognized at law. *See* James B. Ames, *Specialty Contracts and Equitable Defenses*, 9 Harv. L.Rev. 49 (1896) (discussing the development of these defenses in specialty contracts). Slowly, after the formalism of the law dissipated, other defenses were recognized. The Superior Court Civil Rules expressly contemplate both fraud and mistake. Superior Ct. Civ. R. 9(b). Moreover, notwithstanding its bifurcation, Delaware's Courts have continued the adoption of equitable principles by judicial recognition in the good tradition of evolution and growth of the common law.

One of the defenses that the parties wish to assert in this case is equitable estoppel, which has long been recognized at law. *See* E.W. Hinton, *Equitable Defenses Under Modern Codes*, 18 Mich. L.Rev. 717, 721 (1920). In 1880, the United States Supreme Court recognized that "[t]he doctrine of equitable estoppel is, as its name indicates, chiefly, if not wholly, derived from courts of equity, and as these courts apply it to any species of property, there would seem no reason why its application should be restricted in courts of law." *Kirk v. Hamilton*, 102 U.S. 68, 78,

26 L.Ed. 79 (1880). By 1938 in this country, equitable estoppel was regarded as "fully adopted" by Courts of law. William F. Walsh, *Is Equity Decadent?*, 22 Minn. L.Rev. 479, 485 (1938). The adoption of equitable estoppel in Courts of law was recognized in Delaware. *See Colvocoresses v. W.S. Wasserman Co.*, Del.Super., 8 W.W. Harr. 253, 190 A. 607, 613 (1937) (holding that it is "beyond question" that the principles of equitable estoppel can be applied in Courts of law, and the law of estoppel will prevent the exercise of a clear and otherwise unquestioned contract right in defense of an action brought); *see also* cases cited in *Colvocoresses.*

Similarly, the doctrine of rescission (both a cause of action and a defense) has also been recognized at law in Delaware. *Quinn v. Mitchell*, Del. Ch., Civ. A. No. 9559, Hartnett, V.C. (Feb. 13, 1989); *see also, Josloff v. Falbourn*, Del.Supr., 2 W.W. Harr. 433, 125 A. 349, 350 (1924). Chancellor Allen recognized that a law Court may, upon adjudication of a contract dispute, determine, where the elements of a claim are proven, that a contract has been rescinded, and enter an order restoring Plaintiff to his original condition by awarding money or other property of which he had been deprived. *E.I. DuPont de Nemours & Co. v. HEM Research, Inc.*, Del. Ch., 576 A.2d 635 (1989) Allen, C. (Oct. 13, 1989) (citing 12A C.J.S. *Cancellation of Instruments* § 4 (1980)). Chancellor Allen also noted that there is a distinction between rescission at law and equitable rescission, and stated that equitable rescission typically requires a Court to cause an instrument, document, obligation or other matter affecting Plaintiff's rights and/or liabilities to be set aside and annulled, thus restoring Plaintiff to his

---

**14.** Professor Ames notes that the defense of duress was recognized at law under the common law, but the recognition of the defense may have been due to a forgotten statute. Ames states that whatever its origin, duress did not differ in its nature from the defense of fraud.

original position and reestablishing title or recovering possession of property. *Id.* (citing 3 *Pomeroy's Equity Jurisprudence* § 872).[15]

Other equitable defenses are commonly recognized at law in contract as well as tort. Ripeness and mootness, which were originally equitable in nature, are commonly applied by this Court. *Mt. Hawley Ins. Co. v. Jenny Craig, Inc.*, Del.Super., 668 A.2d 763, 766–67 (1995); *Tulou v. Raytheon Service Co.*, Del.Super., 659 A.2d 796 (1995), Herlihy, J. (May 4, 1995). Waiver has been, for some time, used at law as a valid defense to contract suits. *See Joseph Rizzo & Sons v. Christina Momentum, L.P.*, Del.Super., C.A. No. 88L–AP–15, 1992 WL 51850, Babiarz, J. (Feb. 21, 1992); *Willard F. Deputy & Co. v. Hastings*, Del.Super., 2 W.W. Harr. 345, 123 A. 33, 35 (1923); *Lofland v. Emory*, Del.Super., 2 Harr. 297 (1837). Likewise, the equitable doctrine of acquiescence has been applied by this Court. *See Pennsylvania R.R. Co. v. Stauffer Chemical Co.*, Del.Super., 255 A.2d 696, 699–700 (1969) (allowing the defense of acquiescence); *see also,* Dobbs, *Remedies,* at 44 (acquiescence is regularly used in purely legal cases).

Ratification, which was originally an equitable defense, has also been recognized by this Court at law. *See Colish v. Brandywine Raceway Ass'n*, Del.Super., 10 Terry 493, 119 A.2d 887, 892 (1955) (holding that there was no ratification of a contract); *Hirzel Funeral Homes, Inc. v. Equitable Trust Co.*, Del.Super., 7 Terry 334, 83 A.2d 700, 701–02 (1951) (holding that an attempted ratification of a burial contract was not binding upon an estate). Also the doctrine of impossibility of performance has been recognized in this State as an action at law. *See Shaw v. General*

*Chemical Co.*, Del.Super., 2 W.W. Harr. 172, 120 A. 850, 851 (1922) ("A contract will not be construed to bind one of the parties thereto to do a thing physically impossible of performance unless the language of the contract should be so exacting as to permit of no other reasonable construction"); *see generally, Hudson v. D & V Mason Contractors, Inc.*, Del.Super., 252 A.2d 166 (1969) (evaluating a Motion to Dismiss on a claim of impossibility of performance).

Similarly, unconscionability, whose precepts are equitable in nature, is used as a defense under the UCC and in other contract actions in the Delaware Superior Court. 6 *Del. C.* § 2–302; Restatement (Second) of Contracts § 208; *Crowell Corp. v. Himont USA, Inc.*, Del.Super., Civ. A. No. 86C–11–125, 1994 WL 762663, Babiarz, J. (Dec. 8, 1994); *J.A. Jones Construction Co. v. City of Dover*, Del.Super., 372 A.2d 540, 552 (1977), *app. dism.*, Del. Supr., 377 A.2d 1 (1977).

■ Courts of law have become increasingly flexible and have abandoned the worship of formalism and technicality that spawned the development of the split system of law and equity in England. *See* deFuniak, *Handbook of Modern Equity,* at 5. The Superior Court Civil Rules mirror the Federal Rules of Civil Procedure, including provisions for liberal joinder of parties, consolidation of cases, class actions, broad discovery testimony by parties, bench trials, use of affidavits and notice pleading, all products of equity. This State, one of the few remaining with a split system, should follow the liberal trend and freely allow equitable defenses at law. Indeed, we would be foolish to deny our trial law Court of general jurisdiction the full range of relief provided in

---

15. One might question whether the Chancellor chose the right case to decline jurisdiction. The *HEM* case seems a good one for a formal cancellation order. Perhaps we would worry less about trifles if we accepted a broader view of concurrent jurisdiction, especially given a practical concept of inadequacy.

merged Courts on legal claims. Moreover, this is not a change. The Superior Court, as noted above, has, for some time, used equitable defenses in law actions. This Court recognizes that certain equitable defenses which are purely equitable in nature (unclean hands,[16] balance of hardships,[17] and laches[18]) may present adoptability problems. Formal, impractical distinctions, however, should be set aside and the Superior Court now has and should have broad power to hear equitable defenses simply because the issues raised by the defenses are part of the heart and soul of modern litigation. Hopefully, the number of occasions when jurisdictional questions are raised will decline even more.

## DISCUSSION

### I. Defendants' Motion for Summary Judgment

█ The Defendants in this case claim that there have been no damages incurred by the Plaintiffs because there is no evidence that USHT would have found the necessary equity investors to become the financiers of the Hydrotel project.[19] Defendants argue that USHT was not in a position to act on any of the contracts, written or oral, given by the Hungarian authorities because, essentially, Dr. Jacob's group did not have the money to complete the project. Therefore, Defendants claim that if equity financing could not have been obtained, no damage could have been suffered because the Plaintiffs could not have acted on the contracts. In support of their argument, Defendants state that, in well over two years, an equity investor was never located for the project. And, Defendants argue that the Plaintiffs have not provided the requisite expert testimony that the economics of the USHT plan were such that it was likely that USHT could, in fact, find the required equity.

16. The defense of "unclean hands" is generally inappropriate for legal remedies. *Miller v. Beneficial Management Corp.,* D.N.J., 855 F.Supp. 691, 717 n. 28 (1994). Professor Chafee rejects the idea that the equitable maxim of "unclean hands" is purely equitable in nature. Rather, he argues that it is really a bundle of rules relating to diverse subjects. Zechariah Chafee, Jr., *Coming into Equity with Clean Hands,* 47 Mich. L.Rev. 877, 878 (1949). Laycock notes a "legal counterpart, *in pari delicto*" (citing *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985); *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), *overruled on other grounds, Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984)).

17. The balance of hardships is peculiarly attaching to the equitable weighing of factors on determining whether to issue an injunction. But Laycock notes it has a role to play occasionally in damages. Laycock, at 70 (citing Restatement (Second) of Contracts § 348(2)(b)).

18. It appears that in most Courts, laches cannot be asserted in an action at law. It is not, however, uniform black letter law that laches in inapplicable to claims at law. *Coleman v. O'Grady,* Ill.App., 207 Ill.App.3d 43, 152 Ill. Dec. 11, 565 N.E.2d 253, 258 (1990), *app. denied,* Ill.Supr., 137 Ill.2d 664, 156 Ill.Dec. 560, 571 N.E.2d 147 (1991); *see also, Plaza Condominium Ass'n, Inc. v. Wellington Corp.,* Ky.Supr., 920 S.W.2d 51, 54 (1996) (holding that the equitable doctrine of laches is an available defense even when the applicable statute of limitations has not yet expired); *Sutton v. Davis,* Tenn.App., 916 S.W.2d 937, 941 (1995) ("laches may also bar purely legal claims"); *Maksym v. Loesch,* 7th Cir., 937 F.2d 1237, 1247–48 (noting that laches is an equitable doctrine increasingly being applied at law); Dobbs, *Remedies,* at 44 (noting that perhaps laches is now regularly used in purely legal cases). Laches is largely unnecessary at law in Delaware because of our still relatively short statute of limitations in personal injury lawsuits (two years).

19. It appears that the Plaintiffs' theory of damages is predicated on the fact that they would have constructed and operated the Hydrotel project.

In response to the no proof of damage claims by the Defendants, Plaintiffs argue that any attempt by the Defendants to argue that Plaintiffs could not have found an additional investor is a superseding cause, and that, because Defendants did not plead superseding cause as an affirmative defense, that defense is not timely and must be deemed waived. Plaintiffs also state that they are not required to provide expert testimony to show the absence of a superseding cause. More importantly, Plaintiffs claim they would have obtained an equity investor. In support of their argument that they would have obtained an equity investor, the Plaintiffs offer the testimony of Mr. Ronald Carlberg. Mr. Carlberg was employed by the International Planning and Analysis Center, which was retained by USHT to market the Hydrotel project to potential equity investors. Mr. Carlberg states that there was a "significant amount of interest" in the Hydrotel project with investors. Carlberg Dep. at 20, Dkt. No. 135, Ex. 1. Mr. Carlberg, however, is not offered as an expert in this case. He appears to be the only witness that is offered to prove the cause of damages and specifically to prove that the Plaintiffs would have obtained an equity investor. The parties have discussed the issue as one of proximate cause, a concept more familiar in tort than in contract. But it does not seem inappropriate to look to tort law for guidance.

▮▮▮ The issue of proximate cause is normally a question for the jury. *Mazda Motor Corp. v. Lindahl*, Del.Supr., 706 A.2d 526, 533 (1998). It is permissible for a Plaintiff to make a *prima facie* case that a Defendant's conduct was a proximate cause of the Plaintiff's injuries based upon an inference from the Plaintiff's competent evidence, if such a finding relates to a matter which is within a lay person's scope of knowledge. *Money v. Manville Corp. Asbestos Disease Compensation Trust Fund*, Del.Supr., 596 A.2d 1372, 1375 (1991). If the matter in issue is one within the knowledge of experts only, and not within the common knowledge of laymen, it is necessary for the Plaintiff to introduce expert testimony in order to establish a *prima facie* case. *Id.* Where the question of proximate cause requires an understanding and analysis of issues beyond the ken of the typical jury, the absence of such expert testimony will preclude the issue from ever reaching the jury. *Mazda Motor Corp.*, 706 A.2d at 533.

In this case, there was no equity investor ready, willing, and able to step forward to provide the equity financing in the Hydrotel project. Therefore, the Plaintiffs need to make out a *prima facia* case that the Defendant's conduct caused the injuries claimed. Here, all the Plaintiffs have offered is Mr. Carlberg's testimony as to causation.[20] Mr. Carlberg's statements are:

> My feeling is, based on that year and a half of prior experience in contacting sources, is that we had an excellent business plan and a significant amount of interest. People like Soros Capital had told us—who invest heavily in Eastern Europe, said that this is one of the best plans that they had seen put together for any projects in Eastern Europe and actually complimented Dr. Jacob on having done a very thorough job.... so I felt that we had an excellent business plan, and we had a solid prospect to make this happen, and I thought I had enough interest from prior sources that I was pursuing, plus opportunities for new sources, that we could have re-

---

20. Plaintiffs submit that Mr. Carlberg's lay opinion testimony can be given under D.R.E. 701. *See* Plaintiffs' Ans. Br. at 11, Dkt. No. 153.

placed GTS in the process with another source of capital. I had a high confidence factor in that.

Carlberg Dep. at 20, Dkt. No. 135, Ex. 1.

 In Delaware, a lay witness can testify in the form of inference and opinion when (1) the witness cannot readily, with equal accuracy and adequacy, communicate what he has perceived to the trier of fact without testifying in terms of inferences and opinions, and his use of inferences and opinions will not mislead the trier of fact to the prejudice of the objecting party; and (2) the opinions and inferences do not require a special knowledge, skill, experience and training. D.R.E. 701. The Plaintiffs are asking this Court to allow Mr. Carlberg to testify as a lay witness as to whether or not USHT could have attracted investors. In dealing with such complex matters, there is special knowledge, experience, and training that is necessary to make such a prediction. Mr. Carlberg's self-serving lay opinion testimony cannot establish that USHT could have obtained equity financing. Some sort of expert testimony is needed to establish the availability of the financing because, in a complex case like this one, whether or not USHT could have obtained equity financing requires an understanding and analysis of issues beyond the ken of the typical jury. *Mazda Motor Corp.*, 706 A.2d at 533.[21] There is no expert evidence to show

that, but for the Defendants' breach of the alleged oral first right of refusal contract, the Plaintiffs would have been able to obtain the Hydrotel contract anew and then gain equity financing (which they did not get in the first go-round) to pursue the project. All and all, it appears that, under the Delaware Rules of Evidence, expert testimony is required in this situation.[22]

 Plaintiffs argue that the existence of an alternate, superseding proximate cause is an affirmative defense which the Defendants have the burden of pleading and proving. Plaintiffs state that Defendants did not fairly put them on notice of an obligation to provide expert testimony to show the absence of a superseding cause. Therefore, Plaintiffs state that, because this superseding cause was not alleged as an affirmative defense, it must be waived. Indeed, under Superior Court Civil Rule 8(c), failure to timely assert an affirmative defense can constitute a waiver of the right to do so. *Cannelongo v. Fidelity America Small Bus. Inv. Co.*, Del. Supr., 540 A.2d 435, 440 (1988). But, where the defense of a superseding cause is raised, a Defendant's liability depends on whether the subsequent negligence of the third party should have been reasonably foreseen or reasonably anticipated by the initial tortfeasor. *Nutt v. GAF Corp.*, Del.Super., 526 A.2d 564, 567 (1987). The easy answer to this argument is that the

---

21. Even if Mr. Carlberg could validly establish that USHT could have obtained equity financing, his opinion is partially invalid because his lay testimony is based upon the statements of others. Mr. Carlberg's view that USHT could in fact gain an equity investor because he was told he had an excellent business plan was based, at least in part, on inadmissible hearsay. Only an expert witness is permitted to rely on hearsay evidence in formulating opinions. *U.S. v. Elekwachi*, 9th Cir., No. 96–10014, 1997 WL 174160 (Apr. 2, 1997) (MEMORANDUM), D.A.E. 703.

22. Delaware Courts have not adopted Federal Rule 701 (allowing lay opinion testimony if it is (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue) because the Rules Committee felt that the Federal version of Rule 701 was overly broad and might permit a nonexpert witness to testify as to matters to which he ought not be permitted to testify. D.R.E. 701, Comment. Nonexpert witnesses should not be given carte blanche permission to give their opinions. *Id.*

Court would liberally permit any necessary amendment to the pleadings to allow this issue, almost inherently central in the case and hardly a surprise, to be heard. But the Court also questions the merits of the argument.

■ The use of expert testimony to prove that the Plaintiffs could or could not have raised the equity financing is not a defense of a "superseding cause." Here, there is no allegation that the subsequent negligence of a third party should have been reasonably foreseen.[23] *Id.* The Plaintiffs must prove that they suffered damage as a result of the alleged breach of the contract. If they could not have raised the financing, any breach by GTS would not result in damage. This is not a situation where Plaintiffs had financing ready to go and but for the breach they were damaged.

■ While the Court is inclined to grant Summary Judgment on the contract claims for failure of proof of damages and for failure to provide expert testimony as to damages, that does not theoretically end the matter. It is repeatedly announced by the Courts that, where the Plaintiff establishes the fact of loss in contract, but not its amount, he may recover nominal damages. Charles T. McCormick, *Handbook on the Law of Damages,* 91 (1935); Arthur L. Corbin, *Corbin on Contracts* § 1001 (1964).

> "Nominal" damages are not given as an equivalent for the wrong, but rather merely in recognition of a technical injury and by way of declaring the rights of the plaintiff. Nominal damages are usually assessed in a trivial amount, selected simply for the purpose of declaring an infraction of the Plaintiff's rights and the commission of a wrong.

David L. Finger & Louis J. Finger, *Delaware Trial Handbook,* § 22:1 (1994).

It seems farfetched that the Plaintiffs in this case would pursue this extended and expensive case simply for nominal damages to prove "technical injury." But I suppose technically Summary Judgment is not available on this ground. Therefore, because the Plaintiffs have not offered expert testimony to prove they would have obtained equity financing, the Court rules as a matter of law that the Plaintiffs cannot recover more than nominal damages, which the Court fixes at one dollar. IT IS SO ORDERED.

■ Even if the Plaintiffs wish to pursue this case for nominal damages, it appears the Defendants should be awarded Summary Judgment on alternative grounds. Defendants seek Summary Judgment in this case, claiming that they did not breach the express terms of the non-disclosure/non-compete agreement signed by Defendants and USHT. The breach of the agreement alleged by the Plaintiffs appears to be a $500,000 investment in Hydrotel by GTS, thereby acquiring a 25% interest in Hydrotel. The Defendants claim that the terms of the non-disclosure/non-compete agreement are unambiguous. Defendants argue that the agreement only prohibited the "specific application" described by the Plaintiffs in Schedule B to the agreement. Defendants also claim that there is nothing in the agreement that prohibits GTS from establishing a business relationship with Hydrotel.

■ The parties agree that Delaware law applies to the written contracts in this case. In Delaware, all written contracts, as well as legislative acts, are to be read, understood and interpreted according to the plain and ordinary meaning and import

---

**23.** Plaintiffs' counsel tacitly conceded this point at oral argument.

of the language employed in them. *Neary v. Philadelphia, W. & B.R. Co.,* Del. Ct. Err. and App., 7 Houst. 419, 9 A. 405, 407 (1887); *Phillips Home Builders v. Travelers Ins. Co.,* Del.Supr., 700 A.2d 127, 129 (1997) ("[I]f the relevant contract language is clear and unambiguous, courts must give the language its plain meaning"). Here, the non-disclosure/non-compete agreement states:

> In order to evaluate the mutual benefit of combining these two applications and developing a single communications network to support the applications and other commercial opportunities, the Parties agree (i) that, for a period of 24 months after the date hereof and (ii) without the parties written agreement:
>
> (a) Neither GTS or USH shall pursue the other party's application (for USH this shall mean the specific application being developed by GTS as described on Schedule A; for GTS this shall mean the specific application described by USH on Schedule B) for a period of 24 months from the date of this Agreement . . . .

Schedule B states:

The application referenced hereby is the HYDROTEL—HUNGARY Nationwide Wireless Telecommunications Network based on a Frame Relay and ATM technology composed of 135 microwave rings with 36.8 Mbps nominal capacity capable of delivering 184 Mbps transmission volume anywhere in the network. Connecting to the nationwide backbone is a second layer of microwave concentrator networks utilizing 1E1 and 2E1 SST (Spread Spectrum technology) and 23GHz or 38 GHz transmission with higher than 2E1 capacity, where needed. Subscriber connection is provided by SST radios or by wire, where available. IEN (Integrated Enterprise Networking Equipment) will provide network access and data/voice compression throughout the network. The Network is designed to provide end-to-end virtual private network services, including, but not limited to data and compressed voice transmission, to commercial and institutional subscribers.

Here, Defendants ask this Court to determine as a matter of law that the non-disclosure/non-compete agreement was not breached because GTS–Hungaro/Hydrotel investment and contract did not pursue the "specific application" as described in the technical specifications of Schedule B. Defendants assert that there is nothing in the agreement that precludes GTS from investing in Hydrotel. Plaintiffs counter that this investment resulted in GTS obtaining voting control over the strategic planning of Hydrotel as well as gaining control of the assets, which included the radio frequency licenses and the radio towers. There can be no doubt, however, that the agreement here was quite specific and was limited to Schedule B. That limitation may have made the agreement operationally ineffective and somewhat illusionary, but the limitation was clearly expressed and must govern as the intention of the parties.

The purpose of the agreement is for Plaintiffs to "have basically a piece of business that they think is interesting or valuable to them and they would like to have a clear track on that without having other people take the information and basically exploit[ ] it." Toth Dep. at 40, Dkt. No. 135, Ex. 4. Here, however, GTS did not pursue the "specific application" proposed by USHV. There were significant differences between the plans of Dr. Jacob and the plans eventually submitted to be used by GTS. The differences between the parties' plans were well documented in a let-

ter written by Dr. Jacob on December 12, 1996. In overview, Dr. Jacob said:

> I find ... [your] preliminary plan grossly inadequate.... I believe, however, that the performance can be dramatically improved if we return to the original concept, technology, and design of the network ....

Dkt. No. 136, Ex. 30.

This evaluation alone constitutes almost conclusive evidence that the parties were not on the same page with the project. It appears that GTS wanted to move in a direction different than the "specific application" in USHV's plan. The parties were in dispute concerning the proper backbone and routing of the network and how the network should be set up. Dkt. No. 167, Ex. A. These disputes seemed to center around whether a star or a loop network should be used. Dkt. No. 167, Ex. B. Additionally, Dr. Jacob did not support GTS' use of ATM technology. Dkt. No. 136, Ex. 30. Moreover, the "specific application" in the non-compete agreement could not have been pursued because the system was never built. *See* Declaration of Geza Szathmari, ¶¶ 9–10. Additionally, there was nothing in the written terms of the non-disclosure/non-compete agreement preventing GTS from making an investment in Hydrotel. In fact, if GTS had not made the $500,000 investment in Hydrotel, the OVF water management authorities would have taken steps to wind-up and liquidate Hydrotel. Varga Dep. at 36, Dkt. No. 160, Ex. B. While the investment in Hydrotel by GTS gave GTS voting and management control over the Hydrotel project, that control did not automatically result in a breach of any of the terms of the written agreement without GTS pursuing the specific application addressed in Schedule B. Dr. Jacob now claims that the differences in the projects were merely details, but even he acknowledged in 1996 that his plan was quite different than that of GTS. Dkt. No. 136, Ex. 30; *see also,* Declaration of Geza Szathmari, ¶¶ 9–10. The Court must conclude, as a matter of law, that the Defendants did not breach the express terms of the non-disclosure/non-compete agreement and no reasonable jury would find otherwise.

Because these questions are dispositive of the case, there is no reasons to consider the alternative grounds for Summary Judgment or rulings of law as asserted in the briefs. I am also returning to Mr. Parkins the written "Memorandum" from Andrea Gyuracz, which I think is properly subject to a claim of privilege, but that issue is now moot as well. For the foregoing reasons, the Defendants' Motion for Summary Judgment is GRANTED. IT IS SO ORDERED.