IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE


TMIP PARTICIPANTS LLC, )
                                            )
                    Plaintiff,              )
                                            )       C.A. No. 11328-ML
                                            )
DSW GROUP HOLDINGS LLC,          )
                                            )
                    Defendant.            )


MASTER'S REPORT

Date Submitted: November 20, 2015
Final Report: February 4, 2016


Brett D. Fallon, Esquire and Albert J. Carroll, Esquire, of MORRIS JAMES LLP, Wilmington, Delaware; OF COUNSEL: Michael Starr, Esquire, of HOLLAND & KNIGHT LLP, New York, New York; Attorneys for Plaintiff.

John D. Demmy, Esquire, of STEVENS & LEE, P.C., Wilmington, Delaware; OF COUNSEL: Peter J.W. Sherwin, Esquire and Massiel Pedreira-Bethencourt, Esquire, of PROSKAUER ROSE LLP, New York, New York; Attorneys for Defendants.

LEGROW, Master

TMIP Participants LLC ("Participants") filed this action to compel arbitration of a dispute between Participants and Defendant DSW Group Holdings LLC ("Seller"). The parties' dispute involves an incentive plan entered into between Seller and its executive employees at a time when Seller actively was seeking a buyer for its business. The incentive plan entitled the executive employees to a bonus upon successful completion of a qualifying sale, with the percentage of the bonus increasing in intervals based upon the purchase price. Those executive employees' interests now are represented by Participants.

The basis for the parties' disagreement is Seller's calculation of the bonus owed to the executive employees. To simplify, Seller contends that the proceeds received from the transaction fell within a range entitling the executive employees to 4.5% of the net equity value of the business; Participants contends that the proceeds received from the transaction fell within a range entitling the executive employees to 6.75% of the net equity value. The funds at issue are in escrow and the calculation that is the subject of the parties' disagreement is governed by both the merger agreement and the escrow agreement. The escrow agreement establishes a procedure for the buyer to dispute various calculations made by Seller and requires the parties to arbitrate disputes that they do not resolve after good faith negotiations. This is the arbitration clause Participants seeks to enforce by this action. Seller contends that the arbitration clause does not apply for a variety

of reasons. The parties have filed cross-motions for summary judgment, in addition to a motion to dismiss that Seller filed challenging Participants' standing to enforce the arbitration clause. For the reasons that follow, I believe the parties' dispute is arbitrable and therefore recommend that the Court grant Participants' motion for summary judgment. This is my final report.

## FACTUAL BACKGROUND

### A. The Merger

This action stems from the sale of a company, DS Services of America, Inc., previously known as DS Waters of America, Inc. (the "Company"), and a deferred compensation plan instituted to incentivize executive employees of the Company to help maximize the Company's sale price. The compensation plan was called the "DS Waters of America, Inc. Transaction Management Incentive Plan" (the "Incentive Plan"). At the time the Incentive Plan was adopted, the Company was Seller's sole asset. Under an Agreement and Plan of Merger dated July 23, 2013 (the "Merger Agreement"), Seller sold the Company to Crestview DSW Investors, L.P. ("Buyer").

Under Article IV of the Incentive Plan, the Plan is to be administered by the Incentive Plan Administrator (the "Plan Administrator").[1] Although the record is somewhat unclear, it appears Seller's board of directors was the Plan

---

[1] Incentive Plan, Ex. A to Verified Compl., *DSW Group Holdings, LLC v. Crestview DSW Investors, L.P.*, C.A. 11168-ML (hereinafter cited as the "Seller's Action").

Administrator. Under both the Incentive Plan and the Merger Agreement, the Plan Administrator has exclusive authority to interpret the Incentive Plan, decide controversies arising out of the Plan, and determine the amount of bonuses paid thereunder.

## B. The merger consideration and the escrowed funds

The merger closed on August 30, 2013. Under Section 2.1 of the Merger Agreement, Buyer was to pay $900 million at closing (the "Estimated Merger Consideration"), subject to certain post-closing adjustments. The parties agreed to escrow $50 million of Estimated Merger Consideration until various Transaction Expenses were determined and paid.[2] Seller, Buyer, and Bank of America, N.A. (the "Escrow Agent") executed an Escrow Agreement dated August 30, 2013, which contained detailed provisions concerning, among other things, how and when the escrowed funds would be disbursed.[3] The bonuses owed under the Incentive Plan were to be paid from escrow and were included in the definition of "Transaction Expenses" in the Merger Agreement.[4] The Escrow Agreement specifies three dates on which Transaction Expenses would be released (a "Release

---

[2] "Transaction Expenses" is defined in Section 1.1 of the Merger Agreement. Verified Compl. Ex. B.
[3] Escrow Agreement, Ex. A to Verified Compl.
[4] Merger Agreement at §1.1, Ex. B to Verified Compl. in Seller's Action.

3

Date").[5]  The money in the escrow account that is not used for Transaction Expenses is to be released to Seller after the final disbursement.[6]

The amount of the incentive bonus was tied to the "Transaction Proceeds"[7] from the merger, with a higher percentage paid if the Transaction Proceeds reached designated levels.  To simplify slightly, Participants' bonus was calculated as a percentage of the Company's net equity value.[8]  The applicable percentage depended on the amount of Transaction Proceeds (relevantly, 4.5% if the Transaction Proceeds met or exceeded $825 million, and 6.75% if the Transaction Proceeds met or exceeded $900 million).[9]

## C. The third disbursement and the present dispute

Before each scheduled Release Date, Seller was to calculate the disbursement amount, including monies due to Participants under the Incentive Plan.  In order to calculate the executive employees' bonus, Seller was required to adjust the Transaction Proceeds, thereby altering the amount due to Participants under the Incentive Plan.  Put differently, under the Merger Agreement, the

---

[5] Escrow Agreement at § 3.5, Ex. A to Verified Compl.
[6] Merger Agreement at § 3.2(b), Ex. B to Verified Compl. in Seller's Action.
[7] The parties appear to use the terms "Merger Consideration" and "Transaction Proceeds" interchangeably.
[8] Net Equity Value is defined in the Incentive Plan and is a formula that includes Transaction Proceeds as one of the inputs.  *See* Incentive Plan § 3.3, Ex. A to Verified Compl. in Seller's Action.
[9] Incentive Plan at Ex. A, Ex. A to Verified Compl. in Seller's Action.

4

Company was to estimate Transaction Proceeds at closing.[10]  The Transaction Proceeds would then be adjusted to account for post-closing Transaction Expenses.[11]  At the time of each disbursement, the Transaction Proceeds figure was to be adjusted by adding to the previously estimated Transaction Proceeds the amount currently being disbursed to Seller.[12]  The increase in Transaction Proceeds at the time of each Release Date resulted in additional amounts payable under the Incentive Plan.

On May 1, 2015, Seller delivered its calculation of the third and final disbursement amount, including the third payout under the Incentive Plan, which Seller calculated as $453,239.92.[13]  Seller's calculation was predicated on Transaction Proceeds totaling less than $900 million, which entitled Participants to 4.5% of the Company's net equity value.[14]  On May 14, 2015, Buyer delivered to Seller its Notice of Disagreements with the calculation.  Buyer's calculation of the third Incentive Plan payout, $4,192,154.65, was predicated on the Transaction Proceeds exceeding $900 million.  Buyer contends that Participants are entitled to 6.75% of the net equity value.[15]  Which party is correct is not the question before

---

[10] Merger Agreement at § 3.1(b)(vi), Ex. B to Verified Compl. in Seller's Action.
[11] *Id.* at §3.1(a)(i).
[12] Def.'s Br. in Further Supp. of its Mot. to Dismiss, in Opp'n to Pl.'s Mot. for Summ. J., and in Supp. of Cross-Mot. for Summ J. at 32 (hereinafter cited as "Def.'s Br. in Opp.").
[13] DSW Letter at 1, Ex. B to Verified Compl.
[14] DSW Letter at Schedule A, Ex. B to Verified Compl.
[15] Crestview Letter, Ex. C to Verified Compl.

the Court, at least at this time. Rather, the issue to be resolved is whether the disputed calculation must be submitted to arbitration.

## D. Arbitration provisions

There are three places where the merger documents discussed the submission of disagreements concerning Transaction Proceeds or Transaction Expenses to an arbitrator[16] — two in the Merger Agreement and one in the Escrow Agreement. Section 3.1 of the Merger Agreement discussed post-closing adjustments to the merger consideration calculation.[17] Section 3.1(b) provided that Buyer would prepare, or order prepared, calculations of Net Working Capital, Net Indebtedness, and Transaction Expenses within 90 days after the closing date. Those calculations, in turn, could increase or decrease the merger consideration as provided in Sections 3.1(b)(iii), 3.1(b)(iv), and 3.1(b)(v). Seller was given 45 days to object to these calculations. If Seller objected, the parties were given 30 days to resolve the dispute, after which the dispute was to be submitted to the arbitrator, KPMG LLP.[18]

Under Section 3.2 of the Merger Agreement, Seller was required to submit calculations representing how specific Transaction Expenses, namely the amounts payable under the Incentive Plan and under an engagement letter with Evercore

---

[16] The parties use the terms "arbitrator" and "independent auditor" interchangeably to refer to the party charged with resolving the dispute. For consistency, I use the term arbitrator.
[17] Merger Agreement at § 3.1(b), Ex. B to Verified Compl. in Seller's Action.
[18] *Id.* at §3.1(b)(ii).

6

Group LLC, were affected, if at all, by specified events. Specifically, Seller was to provide calculations in the event that either (a) the Company recovered any insurance proceeds in accordance with Section 8.7 of the Merger Agreement after the closing, or (b) the Estimated Merger Consideration paid at closing was determined to be less than the final adjusted Merger Consideration, in which case Buyer was to remit the difference to Seller.[19] After delivery of the calculation, Buyer had 3 days to submit disagreements.[20] If the parties could not resolve any such disagreements within 30 days, the dispute was to be referred to the arbitrator.[21]

Finally, Sections 3.6(a) and 3.6(b) of the Escrow Agreement required Seller to deliver written notice of its calculation of the Transaction Expenses to be paid in connection with each of the three Release Dates and for Buyer to notify Seller of any disagreements with each calculation. Section 3.6(c) of the Escrow Agreement provided that "disagreements with respect to a Transaction Expense Calculation delivered by Seller under Section 3.6(a) or (b)" that were not resolved within 30 days of the applicable release date would be submitted to the arbitrator.[22] The provision in its entirety reads as follows:

---

[19] Merger Agreement at §3.2(a)(i) (referencing §3.1(b)(vi)), Ex. B to Verified Compl. in Seller's Action. The remitted money is to be distributed back to the pre-merger stockholders of the Company.
[20] *Id.* at §3.2(a)(i).
[21] *Id*. at §3.2(a)(ii).
[22] Escrow Agreement at § 3.6(c), Ex. A to Verified Compl.

7

(c) If [Buyer] and Seller are unable to resolve all of their disagreements with respect to a Transaction Expense Calculation delivered by Seller under 3.6(a) or (b) within thirty (30) days of the applicable release date, [Buyer] and Seller shall refer their remaining disagreements to the [arbitrator] (as defined in the Merger Agreement), selected in accordance with Section 3.1(b)(ii) of the Merger Agreement, whose decision shall be final and binding on [Buyer] and Seller.[23]

As noted previously, Buyer objected only to Seller's calculation of the final disbursement amount. The parties do not dispute that the objection was timely under Section 3.6, although Seller contends Buyer's objection in fact functions as an untimely objection to previous calculations that are now "final and binding."

E. The assignment of rights

On June 9, 2015, Buyer and Participants entered into an Assignment and Assumption Agreement ("Assignment Agreement") whereby Buyer assigned to Participants certain of Buyer's rights and obligations under the Escrow Agreement, including: (1) Buyer's disagreements with respect to the calculation of the amounts payable under the Incentive Plan, and (2) Buyer's right to refer and resolve any remaining disagreements with the arbitrator.[24] The assignment was approved by the Escrow Agent.[25]

Participants maintains that its efforts to resolve with Seller the disagreements regarding the Transaction Expense Calculation have failed to

---

[23] *Id.*
[24] Assignment Agreement at ¶ 1, Ex. D to Verified Compl.
[25] *Id.*

8

achieve resolution.[26] For this reason, Participants delivered to Seller a Notice of Intent to Arbitrate, dated July 20, 2015.[27] Seller has refused to arbitrate, arguing that the dispute does not fall within the "narrow scope" of Section 3.6 of the Escrow Agreement.[28] Instead, Seller argues that, under provisions in the Incentive Plan, Merger Agreement, and Escrow Agreement, the Plan Administrator is vested with the authority to interpret the plan and resolve disputes such as the present disagreement.[29] Seller argues that this Court's jurisdiction is limited to review of the Plan Administrator's decision for "manifest error."[30]

**F. The Seller's Action**

On June 18, 2015, Seller filed in this Court an action styled *DSW Group Holdings, LLC v. Crestview DSW Investors, L.P.*, C.A. 11168-ML (the "Seller's Action"), seeking a declaratory judgment that the Plan Administrator's determination of the bonus due under the Incentive Plan is binding on all persons.[31] In support of its contention, Seller cited provisions of the Incentive Plan and Merger Agreement that, according to Seller, establish that the Plan Administrator was charged with calculating bonuses.[32]

---

[26] Pl.'s Br. in Supp. of its Mot. for Summ. J. and in Opp'n to Def.'s Mot. to Dismiss at 8 (hereinafter cited as "Pl.'s Opening Br.").
[27] Participants' Notice, Ex. E to Verified Compl.
[28] Def.'s Br. in Opp. at 3.
[29] *Id.* at 24.
[30] *Id.* at 24-25.
[31] Verified Compl. ¶ 1 in Seller's Action.
[32] *Id.* at ¶¶ 8-10.

Buyer answered the Seller's Action on August 5, 2015.[33]  Buyer's answer was filed after Participants initiated this action.  In its answer, Buyer disagreed with Seller's interpretation of the Incentive Plan and the Merger Agreement and invoked Section 3.6(c) of the Escrow Agreement, which provides that disputes concerning the Transaction Expenses Calculation are to be referred to the Independent Auditor.[34]

## G. This action

On June 23, 2015, Participants filed this action to compel arbitration under the Federal Arbitration Act, 9 U.S.C. §1 *et seq*. (the "FAA"), and Section 3.6(c) of the Escrow Agreement and to stay the Seller's Action pending the outcome of this action.[35]  Participants argues that, pursuant to Section 3.6(c) of the Escrow Agreement, the parties are required to arbitrate disagreements concerning the Transaction Expense Calculation before KPMG LLP.[36]  Seller moved to dismiss this action on the basis that Participants lacks standing to enforce the Escrow Agreement.  The parties also filed cross-motions for summary judgment on the issue of whether they are required to arbitrate the Transaction Expense Calculation dispute.

---

[33] Ans. in Seller's Action.
[34] *Id.* at ¶ 21.  Buyer raises several affirmative defenses in the Seller's Action, but they are not relevant to the pending motions.
[35] Verified Compl. at 1.
[36] *Id*. at ¶ 16.

On November 6, 2015, after oral argument on the pending motions, Participants filed a motion for leave to file an amended complaint. In the Amended Complaint, Participants averred that in October 2015, Buyer appointed Participants as its agent for the limited purpose of enforcing against Seller "any and all of [Buyer's] rights under the Escrow Agreement as had been assigned by [Buyer] to Participants pursuant to the Assignment Agreement."[37] Participants also alleged that on October 27, 2015, it delivered to Seller a "Restated Notice of Intent to Arbitrate," indicating that Participants was demanding arbitration in its capacity as agent as well as in its capacity as assignee.[38] Seller objected to the Motion to Amend on the basis that the amendment was untimely and would be futile because the Escrow Agreement limits enforcement solely to executing parties and that limitation extends with equal force to both assignees and agents. I granted the Motion to Amend on November 18, 2015 but invited Seller to submit an additional letter explaining the effect, if any, of the Amended Complaint on Participants' standing. Seller declined to submit additional materials.[39]

---

[37] Pl.'s Am. Compl. ¶ 23.
[38] *Id.* ¶ 24.
[39] Letter to the Court from John Demmy, Esq., dated Nov. 20, 2015.

**ANALYSIS**

## I. Participants has standing to enforce the arbitration clause in the Escrow Agreement.

Seller argues that this action should be dismissed because Participants lacks standing since it is not a party to the Escrow Agreement but merely an assignee of Buyer's rights.[40] Seller's argument is grounded in Section 10.8 of the Escrow Agreement, which provides that the agreement "is enforceable solely by the parties by which it has been executed and no other persons."[41] Section 10.8 indicates that it is the "intention of the parties hereto that this Agreement may not be enforced on a third party beneficiary or any similar basis."[42]

Participants' response to the standing argument takes three main forms: Participants first argues that this action is governed by the federal "substantive law of arbitrability" and Seller therefore is "equitably estopped from avoiding its duty … to arbitrate" under the Escrow Agreement.[43] Second, Participants argues that Section 10.10 of the Escrow Agreement unambiguously permits assignment and that the right to enforce a contract transfers to the assignee under settled Delaware

---

[40] Def.'s Mot. to Dismiss at ¶ 1.
[41] Escrow Agreement, Ex. A to Verified Compl. at § 10.8.
[42] *Id*.
[43] Pl.'s Opening Br. at 25 (citing *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010)).

law.[44] Finally, Participants argues that it has standing as Buyer's agent under the agency agreement between Participants and Buyer that formed the basis for the Amended Complaint.

Seller acknowledges that, whether in this action or in the Seller's Action, the issue of arbitrability of the Transaction Expense Calculation dispute must be decided. At oral argument, Seller therefore conceded that "there is a certain amount of mootness that is hovering over the motion to dismiss," and urged me to decide the arbitrability issue now, notwithstanding the motion to dismiss.[45] Seller nevertheless argues that, although Section 10.10 permits Buyer to assign its *benefits* under the Escrow Agreement, Buyer is not permitted to assign its *right to enforce* the agreement.

Although the parties spilled substantial ink briefing the motion to dismiss, in my view any lingering doubt about Participants' standing is resolved by the amendment to the Complaint and Buyer's appointment of Participants as Buyer's agent. It is well-settled that a business organization, or a private party for that

[44] Pl.'s Opening Br. at 25, 27-28 (citing *USH Ventures v. Global Telesystems Grp., Inc.*, 796 A.2d 7, 16 (Del. Super. 2000); *Amber Res. Co. v. United States*, 538 F.3d 1358, 1379 (Fed. Cir. 2008); *Hall v. State*, 655 A.2d 827, 831 (Del. Super. 1994)).
[45] *TMIP Participants LLC v. DSW Grp. Holdings, LLC*, C.A. No. 11328-ML, at 18 (Del. Ch. Oct. 28, 2015) (TRANSCRIPT) (hereinafter cited as "Tr.") ("I do acknowledge that there is a certain amount of mootness that is hovering over the motion to dismiss. And part of that is because we do acknowledge that, now, the way things have panned out as we stand here today, the issue of substantive arbitrability of the specific dispute at issue has to be resolved and has to be resolved by Your Honor, by this Court.").

matter, may act through an agent in litigation.[46] As a practical matter, it is necessary for corporations and other business entities to act through agents. This principle extends to litigation.[47] Taken to its logical conclusion, Seller's argument would mean that the clause prohibiting third party enforcement prohibits corporate parties from enforcing the agreement at all, since a corporation necessarily must act through its agent.[48] That is not Seller's contention, of course, but Seller offers no principled reason why this Court should allow some agents to enforce the agreement, but not others.

Just as business entities may act through natural persons, a business entity also may act through another business entity as intermediary.[49] Because it is undisputed that Participants properly has been designated as Buyer's agent for the purpose of enforcing, on Buyer's behalf, Buyer's rights under the Escrow Agreement,[50] I find that Participants has standing to enforce the Escrow Agreement

---

[46] *See, e.g., Appriva S'holder Litig. Co., LLC v. EV3, Inc.*, 937 A.2d 1275 (Del. 2007) (discussing both natural persons and business organizations as permissible potential agents to represent stockholders in litigation); *Sussex Cty. v. Sisk*, 2014 WL 3954929, at *3 (Del. Ch. Aug. 13, 2014) (discussing a daughter acting as her mother's agent in litigation).

[47] Jay M. Zitter, J.D., Annotation, *Propriety and Effect of Corporations Appearance Pro Se Through an Agent Who is Not an Attorney*, 8 A.L.R. 5th 653 (1992).

[48] *In re Dole Food Co., Inc. S'holder Litig.*, 110 A.3d 1257, 1261 (Del. Ch. 2015) (quoting *N. Assur. Co. v. Rachlin Clothes Shop*, 125 A. 184, 188 (Del. 1924)) ("[B]eing a purely metaphysical creature, having no mind with which to think, no will with which to determine[,] and no voice with which to speak, [a corporation] must depend upon the faculties of natural persons to determine for it its policies and direct the agencies through which they are to be effectuated.").

[49] *See, e.g. Appriva*, 937 A.2d at 1290-91.

[50] Pl.'s Am. Compl. ¶ 23.

as Buyer's agent. I therefore need not reach the issue of whether Participants might also have standing as an assignee or under equitable principles.

II.    **The Court should grant summary judgment in favor of Participants on the question of substantive arbitrability.**

Participants argues that it is entitled to summary judgment on the question of whether the Transaction Expense Calculation dispute is subject to arbitration under Section 3.6 of the Escrow Agreement. Participants argues that the parties unambiguously agreed to arbitrate disagreements "with respect to" the Transaction Expense Calculation and that the present dispute qualifies as such because it concerns whether Seller properly made certain post-closing adjustments to the calculation of Transaction Proceeds. Participants cites *Viacom International, Inc. v. Winshall* for the proposition that "If the subject matter to be arbitrated is the calculation of an earn-out, or the amount of working capital, or the company's net worth at closing, all issues as to what financial or other information should be considered in performing the calculation are decided by the arbitrator." In the alternative, Participants argues that, even if Section 3.6 does not unambiguously encompass this dispute, Delaware's public policy favoring arbitration requires a reviewing court to compel arbitration as long as the contract "may reasonably be interpreted to require arbitration."

Seller asserts two primary arguments in support of its own motion for summary judgment: (1) the scope of Section 3.6 of the Escrow Agreement does

15

not encompass the parties' current dispute; and (2) the parties' dispute actually relates to decisions the parties agreed would fall within the Plan Administrator's sole discretion. As to the first argument, Seller contends that Section 3.6 of the Escrow Agreement is a narrow provision that does not encompass the parties' present dispute. Seller argues that, although Delaware's public policy favors arbitration, there nonetheless must be a clear expression of the intent to arbitrate contained in a valid agreement. Seller further reasons that questions regarding the scope of an arbitration provision are questions for the Court, absent a clear delegation of such determination to the arbitrator. Seller cites *Tandy Brands Accessories, Inc. v. Chambers Belt Co.* and *Avnet, Inc. v. H.I.G. Source, Inc.*, as analogous cases in which this Court has determined that the parties' dispute was not arbitrable.[51]

Seller examines each of the three arbitration provisions potentially implicated by post-closing adjustments and the Transaction Expense Calculation and argues that each provision is narrow and refers only to disagreements with particular calculations referenced in that provision. In Seller's view, the parties did not agree to arbitrate any broader disagreements that extended beyond the specific subject matter laid out in each arbitration provision. The only provision implicated

---

[51] Def.'s Br. in Opp. at 21-22 (citing *Tandy Brands Accessories, Inc. v. Chambers Belt Co.*, C.A. No. 6342 at 33, 42 (Del. Ch. Sept. 2, 2011) (TRANSCRIPT) (described in *Chambers Belt Co. v. Tandy Brands Accessories, Inc.*, 2012 WL 3104396, at *2 (Del. Super. Ct. July 31, 2012)); *Avnet, Inc. v. H.I.G. Source, Inc.*, 2010 WL 3787581, at *6 (Del. Ch. Sept. 29, 2010)).

in this action is Section 3.6 of the Escrow Agreement. For purposes of the present dispute, Seller argues that Section 3.6 applies only to "disagreements with respect to a Transaction Expense Calculation" in connection with the current (and final) release date, and that Buyer's pending objections to the Transaction Expenses Calculation actually challenge earlier calculations that Buyer did not dispute in a timely manner.[52]

To support this first argument, Seller contends that the parties' agreement to arbitrate "disagreements with respect to a Transaction Expense Calculation" refers only to disagreements concerning either mathematical computation (*i.e.*, arithmetic errors),[53] or the addition of the amount disbursed at the time of the third disbursement to the previous Transaction Proceeds calculation (thereby increasing the Transaction Proceeds and triggering additional payments under the Incentive Plan).[54] According to Seller, Participants' exception relates not to computation, but rather to whether other amounts should have been included in the calculation of the Transaction Proceeds at closing and at the time of the post-closing adjustment

---

[52] Def.'s Br. in Opp. at 28. For example, Section 3.2 of the Merger Agreement, which discusses the calculation of specific Transaction Expenses, provides that Buyer only has three days after delivery to challenge Seller's calculation. Merger Agreement at § 3.2(a)(i), Ex. B. to Verified Compl. in Seller's Action. Similarly, Section 3.6 of the Escrow Agreement provides that challenges to the calculations of each of the three disbursements must be made within ten days after delivery of each calculation. Escrow Agreement at § 3.6(c), Ex. A. to Verified Compl.

[53] Def.'s Br. in Opp. at 34 (arguing that the disagreement is not limited to "calculations," as neither Buyer nor Participants is "asserting that Seller has incorrectly added, multiplied, or otherwise calculated anything. Indeed there is no error in Seller's calculation, and they identify none").

[54] *Id.* at 35.

17

— issues that implicate interpretation of the Incentive Plan and the Merger Agreement and fall outside the scope of Section 3.6.

Seller's second argument in support of its motion for summary judgment relates to the power of the Plan Administrator to "interpret, construe and administer the Plan in its sole discretion" and to "decide any questions and settle all controversies in connection with the Plan."[55] The Plan provides that the Plan Administrator's interpretation and construction of the Incentive Plan is "final, binding and conclusive."[56] That includes all calculations required under the Plan, including the calculation of Transaction Proceeds.[57]

Seller points out that, at the time of closing, the Plan Administrator calculated the Transaction Proceeds as $850 million, which entitled Participants to 4.5% of the net equity value of the Company.[58] Buyer did not object to this determination.[59] The Plan Administrator also calculated the first and second disbursements from the escrow account without objection from Buyer.[60] It was not until the third Release Date that Buyer objected to the Plan Administrator's Transaction Proceeds calculation. Seller argues that the Plan Administrator's exclusive authority to make determinations regarding the calculation of

---

[55] Incentive Plan at Art. IV, Ex. A to Verified Compl. in Seller's Action.
[56] *Id.*
[57] *Id.* at Section 6.13.
[58] Verified Compl. at ¶ 14 in Seller's Action.
[59] *Id.* at ¶ 15.
[60] *Id.* at ¶¶ 16-17.

Transaction Proceeds precludes Buyer from challenging those calculations in an arbitration proceeding. Seller resists framing its objection as a timing issue. Instead, Seller has characterized the dispute as over what amounts to "calculations" and whether it is permissible for the arbitrator to adjudicate a dispute over calculations of the third disbursement amount if doing so would necessitate reconsidering earlier calculations of Transaction Proceeds, which were supposed to be "final and binding" after the dispute period passed.[61]

In response to Seller's arguments, Participants returns to its emphasis on the low standard necessary to compel arbitration, pointing out that the presumption is in favor of arbitration unless it can be said "with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."[62] Similarly, Participants argues that "ambiguities as to the scope of the arbitration clause itself [are] resolved in favor of arbitration."[63] Participants further argues that its interpretation of the arbitration provision is not only reasonable, but in fact more plausible than Seller's, pointing out that it is implausible that the parties would have contemplated hiring a "Big Four" auditor to check computational errors and that the parties' dispute is well-suited for resolution by an

---

[61] Def.'s Br. in Opp. at 36.

[62] *SBC Interactive, Inc. v. Corp. Media Partners*, 1997 WL 810008, at *3 (Del. Ch. Dec. 29, 1997).

[63] Pl.'s Br. in Further Supp. of its Mot. for Summ. J. and in Opp'n to Def.'s Mot. to Dismiss and Mot. for Summ. J. at 8 (hereinafter cited as "Pl.'s Reply Br.") (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995)).

accountant because it concerns whether particular items, such as excess working capital, qualify as Transaction Proceeds.

## A. Settled law favors enforcing the parties' agreement to arbitrate.

It is well-settled that both federal and state law favor arbitration.[64] The parties agree that the FAA applies to this dispute.[65] Participants correctly points out that the standard for enforcing arbitration is low. As this Court explained in *SBC Interactive, Inc. v. Corporate Media Partners*, the presumption in favor of arbitration is "[o]f such force … that the United States Supreme Court and our Delaware [c]ourts have held that the presumption of arbitrability can be overcome *only* if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."[66]

Seller acknowledges this presumption, but argues it only applies to "broad" arbitration clauses, and therefore does not apply here, because Section 3.6 is narrow.[67] Seller misunderstands the law. Although the *SBC Interactive* Court did describe the presumption as particularly powerful when the arbitration clause is "broad," as was the clause in that case, the Court went on to explain that the presence of a broad clause meant that the presumption in favor of arbitrability only

---

[64] *SBC Interactive*, 1997 WL 81008, at *3.

[65] Verified Compl. at 1 (invoking the FAA); Tr. at 24 (explaining that the FAA governs in the instant case). *See also, Viacom Int'l, Inc. v. Winshall*, 2012 WL 3249620, at *10 (Del. Ch. Aug. 9, 2012).

[66] *SBC Interactive*, 1997 WL 81008, at *3 (internal quotation and citation omitted).

[67] Tr. at 57-59.

can be overcome by "an 'express provision' excluding the dispute from the coverage of the arbitration clause."[68]  As I read *SBC Interactive*, the Court's statements regarding the weight given to the presumption when the arbitration clause is broad do not alter the Court's statements indicating that the presumption applies to all arbitration clauses, whether narrow or broad.  Rather, the presumption becomes even more difficult to overcome in cases involving a broad clause, such that explicit exclusion of the dispute from the clause is necessary to avoid arbitration.

### B. The parties' dispute regarding the Transaction Expense Calculation is arbitrable, subject to various procedural defenses to be resolved by the arbitrator.

It is well-established, and the parties agree, that the question of whether the subject matter of a given dispute is arbitrable generally is one for a court.[69] Conversely, if a court determines that a dispute is arbitrable, questions about how the dispute is to be resolved are left to the arbitrator.  This is the distinction between so-called "substantive arbitrability" and "procedural arbitrability."[70] Substantive arbitrability is characterized as the "threshold question of whether the parties agreed to arbitrate" disputes concerning a certain subject matter.[71] Procedural arbitrability, on the other hand, involves "whether the parties have

---

[68] *SBC Interactive*, 1997 WL 81008, at *3.
[69] *Id.*
[70] *Viacom*, 2012 WL 3249620, at *12.
[71] *Weiner v. Milliken Design, Inc.*, 2015 WL 401705, at *8 (Del. Ch. Jan. 30, 2015).

21

complied with the terms of [the] arbitration provision," as well as how an arbitration is to be conducted.[72]   Matters of procedural arbitrability include "whether prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met, as well as allegations of waiver, delay, or a like defense to arbitrability."[73]   In other words, an arbitrator can decide that a dispute is not arbitrable due to procedural failures, but it is not for a court to do so preemptively.[74]

The Delaware Supreme Court has made clear that procedural arbitrability also includes questions about what evidence the arbitrator should consider in deciding the dispute, mentioning specifically the context of calculating payments of an incentive plan.[75]   In *Viacom International, Inc. v. Winshall*, the Supreme Court rejected the reasoning of two previous decisions of this Court, *HDS Investment Holdings, Inc. v. Home Depot, Inc.* and *Nash v. Dayton Superior Corp.*, for misconstruing the distinction between procedural arbitrability and substantive arbitrability.[76]   The Supreme Court explained:

---

[72] *Viacom*, 2012 WL 3249620, at *12.
[73] *Id.*
[74] The result is that, even if the court determines that the dispute is over arbitrable subject matter and hence should be submitted to arbitration, the arbitrator himself then can decide that the dispute is not arbitrable due to a procedural failing.  Therefore, there are two points at which the dispute may be adjudicated non-arbitrable:  one due to substantive arbitrability issues decided by a court, and one due to procedural arbitrability issues decided by an arbitrator.
[75] *Viacom Int'l, Inc. v. Winshall*, 72 A.3d 78, 83-84 (Del. 2013).
[76] *Id.* (*citing HDS Inv. Holdings, Inc. v. Home Depot, Inc.*, 2008 WL 4606262 (Del. Ch. Oct. 17, 2008); *Nash v. Dayton Superior Corp.*, 728 A.2d 59 (Del. Ch. 1998)).

If the subject matter to be arbitrated is the calculation of an earn-out, or the amount of working capital, or the company's net worth at closing, all issues as to what financial or other information should be considered in performing the calculation are decided by the arbitrator. In resolving those issues, the arbitrator may well rely on the terms of the underlying agreement, and the arbitrator's interpretation of the contract is likely to affect the scope of the arbitration. Nonetheless, those decisions fall within the category of procedural arbitrability. They are not "gateway" issues about whether the particular dispute should be arbitrated at all. Rather, they are questions about how the subject of the arbitration should be decided.[77]

Although not identical procedurally or factually, the two decisions criticized in *Viacom* are significant in light of Seller's argument that the dispute is not arbitrable because the calculations that Participants challenges became final and binding at an earlier date. In *HDS*, the Court was asked to interpret the scope of the parties' agreement to arbitrate disagreements about post-closing price adjustments.[78] The issue was whether the arbitrator could consider a document containing a revised calculation of the purchase price adjustment when the document was submitted after the deadline contained in the parties' agreement.[79] The Court of Chancery determined that this was a question of contract interpretation to be decided by the court.[80] The Supreme Court in *Viacom* rejected

---

[77] *Viacom*, 72 A.3d at 83-84. Admittedly, the procedural posture of *Viacom* was different from this case, because it involved an action to vacate an arbitrator's decision. *Viacom*, 2012 WL 3249620, at *11. That distinction does not, however, alter the strength of the *Viacom* court's stance regarding the breadth of procedural arbitrability, nor does it alter that Court's rejection of the reasoning in *HDS* or *Nash*.

[78] *HDS Inv. Holdings,* 2008 WL 4606262.

[79] *Id.* at *8.

[80] *Id.*

that conclusion, finding that it was up to the arbitrator to decide whether the document should be excluded on the basis that it was not timely submitted.[81]

In *Nash*, the dispute concerned a closing balance sheet, which set forth post-closing adjustments to the net worth of the company that was sold.[82] The parties' agreement established set periods for the parties to object to the calculations after the delivery of the balance sheet and to negotiate in good faith over any dispute.[83] Failing a negotiated resolution, the parties agreed to arbitrate their disagreement.[84] The plaintiffs filed suit, alleging that, during their negotiations, the defendant attempted to raise new issues that appeared in neither the closing balance sheet nor the notice of disagreement. In denying the defendant's motion to dismiss, this Court found that there was, "at least potentially, a factual question as to whether the parties intended the arbitration process to permit [the defendant] to revise the [c]losing [b]alance [s]heet in response to objections raised by the [n]otice of [d]isagreement," and that this factual question was within the purview of this Court.[85] The Supreme Court in *Viacom* rejected that reasoning, finding that it was up to the arbitrator to decide whether the agreement between the parties permitted consideration of later adjustments to the closing balance sheet.[86]

---

[81] *Viacom,* 72 A.3d at 83-84.
[82] *Nash*, 728 A.2d at 60.
[83] *Id.*
[84] *Id.*
[85] *Id*. at 61.
[86] *Viacom,* 72 A.3d at 83-84.

Two other decisions on which Seller relies, *Avnet, Inc. v. H.I.G. Source, Inc.* and *Tandy Brands Accessories, Inc. v. Chambers Belt Co.*, both predate *Viacom* and rely on *HDS* and *Nash*, which *Viacom* expressly rejected.[87]  Although those cases might otherwise support Buyer's position in this action, they are no longer good law after *Viacom*, at least on the issue of whether Seller's arguments raise issues of procedural arbitrability or substantive arbitrability.

Most notably, this Court's recent decision in *Weiner v. Milliken Design* interprets and applies the post-*Viacom* standard to a case very similar to this dispute.[88]  *Weiner* concerned an earn-out in connection with a merger.[89]  As in this case, the payments were to be made in three stages (for fiscal years 2010, 2011, and 2012), at which times the amount of the earn-out would be calculated based on various inputs.[90]  The inputs in each stage included figures previously calculated, particularly for fiscal years 2011 and 2012, where the earn-out amount directly depended on the earn-out amount from the previous year.

---

[87] *Avnet*, 2010 WL 3787581, at *6 (Del. Ch. Sept. 29, 2010); *Tandy Brands*, C.A. No. 6342 at 36 (Del. Ch. Sept. 2, 2011) (TRANSCRIPT).  This Court expressly held that *Avnet* no longer is good law after the Delaware Supreme Court's decision in *Viacom*.  *See Weiner v. Milliken Design, Inc.*, 2015 WL 401705, at *11 (Del. Ch. Jan. 30, 2015).

[88] *Weiner*, 2015 WL 401705.

[89] Although the dispute between Participants and Seller concerns a plan to incentivize executive employees to help obtain the best merger price rather than an earn-out to incentivize executive employees to continue adding value to the target company after the merger, the cases are similar as both concern incentive plans for executive employees where the bonuses were disbursed in multiple stages with the calculation of each disbursement dependent on the calculation at the previous stage.

[90] *Weiner*, 2015 WL 401705 at *2-3.

25

In *Weiner,* the parties' agreement established target revenue figures for each fiscal year. For fiscal year 2010, the amount of the earn-out was to be calculated by determining whether the actual 2010 fiscal year revenue met, exceeded, or fell below target.[91] If the actual revenue at least met the target, the earn-out would be a specified amount. If not, the earn-out would be a number between zero and the specified amount (calculated using a formula set out in the agreement).[92] For fiscal years 2011 and 2012, there would be the same base earn-out payment, calculated according to the procedure for 2010 (but with updated target and actual revenue figures to reflect the year in question), but there could also be additional amounts added to the base earn-out.[93] The additional payments for 2011 would be triggered if the sum of the previous years' earn-outs was less than a certain threshold.[94]

In *Weiner*, the buyer was to submit its earn-out calculations to the sellers' representative, after which the sellers' representative had a period in which to object formally.[95] If no objection was made within that time, the earn-out calculation for that year became "final and binding."[96] The parties agreed to arbitrate timely objections to an earn-out calculation.[97] The sellers' representative

---

[91] *Id.* at *2.
[92] *Id.*
[93] *Id.* at *3.
[94] *Id.*
[95] *Id.*
[96] *Id.*
[97] *Id.* at *4.

made no objection to the 2010 earn-out.[98]  Although the sellers' representative complained about the 2011 earn-out calculation, he did not file the dispute certification required to object to that calculation.  The parties agreed that the sellers' representative properly objected to the 2012 earn-out.[99]

The parties in *Weiner* agreed that the dispute was arbitrable, but disagreed about the scope of the issues before the arbitrator.  The sellers' representative argued that the arbitrator should consider alleged breaches of the agreement during 2010 and 2011.[100]  The buyer sought a court order enjoining the arbitrator from arbitrating any claim related to the 2010 and 2011 earn-out calculations, arguing that these calculations had become "final and binding" when the set time period to dispute them expired.[101]  In response, the sellers' representative argued that whether the 2010 and 2011 calculations were in fact "final and binding" was an issue of procedural arbitrability to be determined by the arbitrator and not by the Court.[102]

Citing *Viacom*, this Court held that the issue of whether the claims regarding fiscal years 2010 and 2011 were time-barred was procedural in nature and therefore should be left to the arbitrator.[103]  The Court reasoned that the parties

---

[98] *Id.*
[99] *Id.* at *5.
[100] *Id.*
[101] *Id.*
[102] *Id.*
[103] *Id.* at *10.

27

unambiguously agreed to arbitrate disputes regarding the calculation and payment of earn-outs, and "[t]he fact that [the applicable section of the agreement] delineates the procedural mechanism for perfecting such a 'dispute' and presenting it to the arbitrator does not transform the procedural and formal requirements of that provision into 'gateway questions' of substantive arbitrability."[104] The Court found the Buyer's position particularly unreasonable because the Buyer effectively was asking the Court to send the dispute over the 2012 earn-out to arbitration "but preemptively curtail the scope of the arbitrator's analysis by limiting what financial metrics and inputs he may consider in rendering his arbitral decision. In so doing, [the Buyer] invites a needlessly bifurcated adjudication of the issues in this dispute."[105]

In attempting to minimize the application of *Weiner* to this action, Seller attempts to frame its argument as one regarding the scope of arbitration, rather than a question of whether Participants' disagreements were timely. Seller objects to arbitration of the dispute because Seller argues that the *particular issues* that Participants wants adjudicated in connection with the third Transaction Expense Calculation fall outside the scope of the arbitration provision. Seller concedes that certain sorts of disputes over the third Transaction Expense Calculation would be

---

[104] *Id.* The Court further reasoned that there is an even stronger reason to include the 2010 and 2011 earn-out calculation as potentially arbitrable subject matter given that the 2012 calculation is dependent on the 2010 and 2011 calculations and the parties agreed that the 2012 calculation should be submitted to arbitration. *Id.*
[105] *Id.* at *11.

28

arbitrable — namely disputes concerning the mathematical computations performed to arrive at the third disbursement number.[106] Participants' disagreement, however, is more than merely computational, and instead concerns a substantive accounting issue: deciding between two alternative methods of calculating Transaction Proceeds. For example, one concrete area of disagreement concerns whether "excess" working capital — the difference between net working capital as estimated for determining an estimated closing purchase price and net working capital as determined in a post-closing accounting — should be included as Transaction Proceeds.[107] This accounting decision would have been made, if not at the time of the post-closing adjustment, at least before the first Release Date.

Seller's clever framing notwithstanding, the issues Seller characterizes as questions of "scope" are in fact issues of timeliness and, under *Viacom*, "issues as to what financial or other information should be considered in performing the calculation."[108] Seller's issues concern whether Buyer or Participants observed the necessary time limits to dispute the calculations Participants now seeks to challenge.[109] Prerequisites for arbitrability such as time limits and other issues concerning whether a party followed the proper procedure for seeking arbitration

---

[106] Def.'s Br. in Opp. at 34.

[107] Pl.'s Reply Br. at 12.

[108] 72 A.3d at 83-84.

[109] For example, the procedure for disputing the calculation made at the time of the post-closing adjustment is set out in §3.1 of the Merger Agreement. The procedure for disputing calculations at the time of each of the three disbursements is set out in §3.6 of the Escrow Agreement, with separate time limits for disputing each disbursement.

are questions of procedural arbitrability to be decided by the arbitrator.[110] Once the dispute is submitted to arbitration, the arbitrator may well decide that the issues Participants seeks to resolve cannot be challenged because Participants did not raise them in a timely manner. I express no position on the proper resolution of that question.

Seller also argues that the instant dispute is not arbitrable because it is a not a calculation dispute but a dispute over the interpretation of contract terms, specifically concerning which amounts should be included as "Transaction Proceeds."[111] Seller argues that this issue of interpreting the term "Transaction Proceeds" must be determined by the Plan Administrator, who is vested with the full power "to interpret, construe[,] and administer the Plan in its sole discretion based on the provisions of the Plan" and whose determinations "shall be final, binding and conclusive on all persons (absent manifest error)."[112] Seller further suggests that because both the Merger Agreement and the Escrow Agreement grant jurisdiction to the Court of Chancery to resolve general disputes related to the agreements, review of the Plan Administrator's interpretation is a matter for this Court.[113]

---

[110] *Viacom*, 2012 WL 3249620, at *12.
[111] Def.'s Br. in Opp. at 34.
[112] Incentive Plan at Art. IV, Ex. A to Verified Compl. in Seller's Action.
[113] Def.'s Br. in Opp. at 22-23.

The mere fact that the parties' dispute may require interpretation of contractual terms does not mean the dispute is not arbitrable; Delaware courts repeatedly have recognized that arbitrators, even those without legal training, may be called upon to interpret the parties' agreement in order to render a decision in the arbitration.[114] To the extent Seller is arguing that the parties' agreement to submit to the jurisdiction of this Court to resolve disputes regarding the merger agreement, along with the parties' agreement to be bound by the decisions of the Plan Administrator, trumps the arbitration clause in the Escrow Agreement, that argument contradicts the basic principle that specific language controls over general language in a contract.[115] In other words, notwithstanding the parties' general agreement regarding the discretion afforded the Plan Administrator, they also expressly agreed to a specific procedure to challenge and arbitrate certain calculations over which the Plan Administrator was given discretion. That clear and specific arbitration provision trumps the general forum selection clause in the Merger Agreement, as well as the language giving the Plan Administrator broad discretion to make calculations.

Presented with a similar issue in *Bayless v. Davox Corp.*, this Court held that the parties' post-merger dispute regarding the release of escrowed shares was

[114] *See, e.g. SPX Corp. v. Garda USA, Inc.*, 94 A.3d 745, 751 (Del. 2014); *Bayless v. Davox Corp.*, 2000 WL 268310, at *2-4 (Del. Ch. Mar. 1, 2000).
[115] *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961(Del. 2005) ("Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one.").

subject to the arbitration clause in the escrow agreement, even though the parties' dispute necessarily involved interpretation of the merger agreement, which did not contain an arbitration clause. [116] The Court reasoned that the arbitration clause, which specifically referred to disputes connected to the escrow agreement, should control over the generally-worded dispute resolution provision in the merger agreement.[117] Emphasizing the specificity of the arbitration provision in the escrow agreement, the Court reasoned that it was "much more specifically focused on the precise type of claims pled in the Class complaint than is the merger agreement's dispute resolution clause."[118] The Court therefore concluded that the arbitration clause was "a more reliable expression of the parties' intent as to how they wished to resolve disputes regarding the [e]scrowed [s]hares."[119]

Here, even if the parties contemplated that the Plan Administrator would generally interpret contractual terms, subject to review by this Court, the specificity of the arbitration provision in the Escrow Agreement indicates that disputes concerning the subject matter specifically delineated therein would be carved out and submitted to arbitration. The provisions in the Incentive Plan granting broad interpretive powers to the Plan Administrator do not suggest that the present dispute should not be submitted to arbitration. At most, Seller has a

---

[116] *Bayless*, 2000 WL 268310, at *2-4.
[117] *Id*. at *5.
[118] *Id*.
[119] *Id.*

contract-based argument *to make to the arbitrator* that, under the agreement between the parties, the arbitrator should defer to the Plan Administrator's interpretation of certain contract terms where the Plan Administrator has made such determinations.

Finally, my conclusion regarding substantive arbitrability is bolstered by the general presumption of arbitrability and the "reasonableness" standard articulated in *SBC Interactive*.[120] That is, the role of a Delaware court is to submit a dispute to arbitration unless "it can be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."[121] I find that not only is it plausible that the instant dispute is covered by the arbitration clause in question, but that the alternative interpretations offered by Seller are not plausible.

**CONCLUSION**

For the foregoing reasons, I recommend that the Court deny Seller's Motion to Dismiss and Motion for Summary Judgment and grant Participants' Motion for Summary Judgment. This is my final report and exceptions may be taken in accordance with Court of Chancery Rule 144.

/s/ *Abigail M. LeGrow*
Master in Chancery

---

[120] *SBC Interactive*, 1997 WL 81008, at *3.
[121] *Id.*