# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

NASDI HOLDINGS, LLC, a Delaware limited liability company, and GREAT LAKES DREDGE AND DOCK CORPORATION, a Delaware Corporation,

    Plaintiffs,

v.

NORTH AMERICAN LEASING, INC., a Michigan corporation, DORE & ASSOCIATES CONTRACTING, INC., an Indiana corporation, NASDI, LLC, a Delaware limited liability Company, and YANKEE ENVIRONMENTAL SERVICES, LLC, a Delaware limited liability Company, ARTHUR P. DORE, an individual, ARTHUR M. DORE, an individual, and RIVER FRONT, LLC,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2017-0399-KSJM

## MEMORANDUM OPINION

Date Submitted: January 15, 2019
Date Decided: April 8, 2019

Brian C. Ralston, Mathew A. Golden, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Michael Dockterman, STEPTOE & JOHNSON, LLP, Chicago, Illinois; *Attorneys for Plaintiffs NASDI Holdings, LLC and Great Lakes Dredge and Dock Corporation*.

Joseph B. Cicero, Paul D. Brown, Stephanie H. Dallaire, CHIPMAN BROWN CICERO & COLE, LLP, Wilmington, Delaware; Mark L. McAlpine, Douglas W. Eyre, MCALPINE PC, Auburn Hills, Michigan; *Attorneys for Defendants North American Leasing, Inc., Dore & Associates Contracting, Inc., NASDI, LLC, Yankee Environmental Services, LLC, Arthur P. Dore, Arthur M. Dore, and River Front LLC*.

**McCORMICK, V.C.**

In 2014, North American Leasing, Inc. acquired NASDI, LLC ("NASDI"), a demolition and site-redevelopment business. As part of the sale, the purchaser took control of NASDI's ongoing construction projects, including work under a $20 million subcontract on the Bayonne Bridge between New York and New Jersey. NASDI was required to obtain performance and payment bonds for the Bayonne Bridge subcontract. Post-closing, the purchase agreement obligated the seller and its corporate parent to maintain those bonds, secured by a letter of credit. In exchange, the purchaser and certain affiliates agreed to indemnify the seller for any losses incurred in connection with the bonds or the letter of credit.

In 2017, NASDI walked off the Bayonne Bridge job. As a result, the surety drew more than $20 million on the letter of credit. The seller demanded indemnification under the purchase agreement for this loss. The purchaser refused. This litigation ensued.

The plaintiffs, the seller and its corporate parent, have moved for summary judgment on their claim that the defendants breached the purchase agreement's indemnification provisions. In response, the defendants point to a notice provision in the purchase agreement, which they say obligated the plaintiffs to notice any claims for indemnification relating to the letter of credit by March 16, 2016—before the plaintiffs incurred the losses. The language on which the defendants rely, however, does not apply to claims for indemnification relating to the letter of credit;

1

it only applies to claims concerning representations and warranties. Accordingly, the plaintiffs prevail under the plain language of the purchase agreement.

The plaintiffs have also moved for summary judgment on two affirmative defenses. The defendants argue that the plaintiffs failed to mitigate damages when they refused to cover a $5 million shortfall before NASDI walked off the project. Although the duty to mitigate generally arises *after* a breach has occurred, the defendants rely on events that occurred *before* the relevant breach. The plaintiffs are therefore entitled to summary judgment on the failure-to-mitigate defense. The defendants also assert that the plaintiffs acted with unclean hands because of alleged accounting misrepresentations in the purchase agreement. Because the equitable doctrine of unclean hands may not supply a defense to a purely legal claim, the unclean-hands defense also fails.

## I.  FACTUAL BACKGROUND

The facts are drawn from the parties' affidavits and exhibits attached thereto.

### A.  The Purchase Agreement

Prior to April 23, 2014, NASDI Holdings, LLC ("Seller") owned and operated two companies: NASDI and Yankee Environmental Services, LLC ("Yankee"). NASDI provided demolition and site-redevelopment services on projects throughout

the United States.[1]  On April 23, 2014, Seller sold NASDI and Yankee to North American Leasing, Inc. ("Purchaser") pursuant to an Ownership Interest Purchase Agreement (the "Purchase Agreement").[2]  Purchaser is part of a family of entities affiliated with Arthur P. Dore and his son, Arthur M. Dore.[3]

Purchaser took control of NASDI's ongoing construction projects.  Section 7.7(a) of the agreement, however, obligated Seller's corporate parent, Great Lakes Dredge and Dock Corporation ("Great Lakes"), to maintain existing performance and payment bonds and letters of credit for the ongoing projects.[4]

Section 9.2(e) of the Purchase Agreement provides indemnification to Seller and Great Lakes for all losses "arising out of or relating to or incurred in connection with" the bonds and letters of credit addressed in § 7.7(a).[5]  Section 9.3 of the Purchase Agreement sets out the notice requirements in the event of a claim for indemnification.[6]

---

[1] *See* C.A. No. 2018-0610-KSJM Docket ("Dkt.") 1, Pl.'s Verified Compl. ("Compl.") ¶ 12; Dkt. 34, Defs.' Answer to Verified Compl. ("Ans.") ¶ 12.

[2] Dkt. 35, Aff. of Michael Dockterman ("Dockterman Aff.") Ex. A ("Purchase Agr.").

[3] *Id.*

[4] *Id.* § 7.7.

[5] Section 9.2(e) indemnifies Seller for losses "arising out of, relating to or incurred in connection with (i) the Company Surety Bonds, (ii) the Company Surety Bond Obligations of the Parent or any Subsidiary of the Parent, (iii) the Parent Bond Guarantees, (iv) the Company LC Obligations or (v) the Letter of Credit, in each case, as a result of events occurring following the Closing . . . ." *Id.* § 9.2(e).

[6] *Id.* § 9.3.

In addition to Purchaser, certain of its affiliates executed the Purchase Agreement and owe indemnification obligations under Section 9.2(e): NASDI, Yankee, the Dores, and Dore & Associates Contracting, Inc. ("Dore Inc.") (the "Indemnifying Defendants").[7]

## B. Plaintiffs' Indemnification Claims

### 1. The Bayonne Bridge Claim

One of NASDI's ongoing construction projects transferred under the Purchase Agreement involved the Bayonne Bridge. Prior to the Purchase Agreement, the Port Authority of New York and New Jersey had hired Skanska Koch Kiewit Infrastructure Co. (JV) ("Skanska") to replace the main span roadway and approach structures of the Bayonne Bridge.[8] Skanska subcontracted NASDI to perform demolition for a total price of $20,359,375 (the "Subcontract").[9] The Subcontract required NASDI to furnish separate performance and payment bonds in an amount equal to the Subcontract price (the "Bonds").[10] NASDI initially procured those Bonds from Fidelity and Deposit Company of Maryland and Zurich American

---

[7] *Id.* § 9.2 ("Dore, Purchaser, and the Companies shall, after the closing, jointly and severally Indemnify Seller"); *id.* at p. 1 (defining the "Companies" as "Yankee and NASDI").

[8] Dockterman Aff. Ex. B.

[9] *Id.* App. A.

[10] *Id.* § 18.

Insurance Company ("Zurich").[11]  As part of the sale of NASDI, however, Zurich and the parties to the Purchase Agreement negotiated a new contractual arrangement concerning the Bonds, which resulted in Great Lakes executing a $20 million letter of credit in favor of Zurich (the "Letter of Credit").[12]  Later, that amount was increased to $30 million.[13]  The Bonds and the Letter of Credit are included among those obligations that Section 7.7(a) of the Purchase Agreement required Great Lakes to maintain post-closing.[14]

---

[11] Dockterman Aff. Ex. C (performance bond) & Ex. D (payment bond).

[12] Before the Purchase Agreement, the Bonds were secured by an Agreement of Indemnity and an Equipment Utilization Agreement executed by Great Lakes, NASDI Holdings, NASDI and Yankee.  The sale of NASDI required a new contractual arrangement.  Zurich consented to release Great Lakes, NASDI Holdings, NASDI, and Yankee from their obligations under their initial agreement and to maintain the Bonds in exchange for three new agreements.  First, Dore Inc., Purchaser, River Front, LLC, NASDI and Yankee (the "Dore Indemnitors") executed a General Indemnity Agreement dated April 23, 2014. Dockterman Aff. Ex. F.  That agreement obligated the Dore Indemnitors to indemnify and hold Zurich and its affiliates harmless from any loss or liability arising from or related to the Bonds.  Second, Great Lakes executed a Guarantee and Indemnity Agreement dated April 23, 2014.  Dockterman Aff. Ex. G.  That agreement guaranteed the obligations of the Dore Indemnitors and obligated Great Lakes to indemnify and hold Zurich and its affiliates harmless from any loss or liability arising from or related to those Bonds.  *Id.*  Third, in order to secure its own obligations under guarantee and the Dore Indemnitors' obligations under the General Indemnity Agreement, Great Lakes executed the Letter of Credit Agreement dated April 23, 2014.  Dockterman Aff. Ex. H.  That agreement required Great Lakes to provide the Letter of Credit in favor of Zurich, initially in the amount of $20 million.  *Id.*  Great Lakes procured a Letter of Credit, No. 68069363, issued by Bank of America in favor of Zurich.  Dockterman Aff. Ex. I (Letter of Credit).

[13] Letter of Credit.

[14] Purchase Agr. § 7.7(a).

On February 13, 2017, NASDI notified Skanska of its intent to demobilize from the Bayonne Bridge site immediately.[15]

On February 14, 2017, Seller notified Purchaser that NASDI's failure to perform under the Subcontract could result in losses for which the Indemnifying Defendants, and potentially the Dores, would be obligated to indemnify Plaintiffs.[16]

On February 23, 2017, Skanska declared NASDI in default and terminated the Subcontract, notified Zurich of NASDI's default, and made a demand on Zurich for performance under the performance bond.[17]

On February 24, 2017, Zurich notified Great Lakes that Zurich would look to Great Lakes for indemnity relating to all loss, cost, or expense that Zurich had incurred or expended, or may in the future incur or expend, by reason of the Bonds.[18]

### 2. The Siefert Associates Claim

Siefert Associates LLC ("Siefert") was a subcontractor to NASDI on the Bayonne Bridge project.[19] On March 2, 2017, Siefert filed a proof of claim under

---

[15] Dockterman Aff. Ex. J. (notice of termination).

[16] *Id*. Ex. K. (notice of claim).

[17] *Id*. Ex. L (Skanska termination letter); *id.* Ex. M (Skanska surety demand).

[18] *Id*. Ex. N. (Skanska Feb. 24 letter).

[19] Compl. ¶ 27; Ans. ¶ 27.

the payment bond, alleging that NASDI failed to pay $328,554 for labor and materials provided by Siefert.[20]

On April 5, 2017, Seller gave notice to Purchaser that the Siefert claim could result in losses for which the Indemnifying Defendants would be obligated to indemnify Plaintiffs.[21]

### 3. Plaintiffs Incur Losses

As of May 11, 2017, Zurich had begun drawing down on the Letter of Credit.[22] The Verified Complaint alleges that by May 22, 2017, Zurich had completed that process, drawing a total of $20,881,824.00 plus $52,204.56 for bank fees (the "2017 Losses").[23]

### C. This Litigation

On May 26, 2017, Plaintiffs commenced this litigation. The Verified Complaint asserts three causes of action: breach of the Purchase Agreement, equitable subrogation, and declaratory judgment. The Indemnifying Defendants

---

[20] Dockterman Aff. Ex. O (Siefert proof of claim).

[21] *Id.* Ex. P (NASDI Apr. 5 notice of claim).

[22] *Id.* Ex. Q (Zurich May 11 letter). The May 11, 2017 letter informed Great Lakes that Skanska had transmitted to Zurich invoices requesting reimbursement under the performance bond as well as Skanska's estimate of the cost of completing the work on NASDI's Bayonne Bridge subcontract. The letter also informed Great Lakes that Zurich had transmitted a check in the amount of $327,946.75 to Siefert in partial satisfaction of the Siefert Claim. The letter further informed Great Lakes that Zurich had set a reserve in the sum of $20,538,584.55.

[23] Compl. ¶ 31. The Indemnifying Defendants do not appear to dispute, as a general matter, that Plaintiffs have incurred losses, although they deny the precise amount.

moved to dismiss or stay the case. [24]  After a hearing on December 1, 2017, the Court

denied the motion.[25]  The Indemnifying Defendants filed their answer to the Verified

Complaint on January 19, 2018,[26] and Plaintiffs moved for summary judgment on

their claim for breach of contract on March 9, 2018.[27]  After briefing concluded,[28]

the Court heard oral arguments on January 15, 2019.[29]

## II.    ANALYSIS

Through their motion for partial summary judgment, Plaintiffs seek a ruling

that Section 9.2(e) of the Purchase Agreement obligates the Indemnifying Defendants

---

[24] Dkt. 8, 11, 13, & 15.

[25] Dkt. 30, Tr. of Oral Arg. on Defs.' Mot. to Dismiss or, in the Alternative, to Stay and Rulings of the Ct. at 19–23.

[26] Dkt. 34.

[27] Dkt. 35.

[28] *See* Dkt. 35, Br. in Supp. of Pls.' Mot. for Partial Summ. J. ("Pls.' Opening Br."); Dkt. 39, Defs.' Answering Br. in Opp'n to Pls.' Mot. for Partial Summ. J. ("Defs.' Ans. Br."); Dkt. 41, Reply Br. in Supp. of Pls.' Mot. for Partial Summ. J. ("Pls.' Reply Br.").

[29] Dkt. 48, Tr. of Oral Arg. regarding Pls.' Mot. for Partial Summ. J. ("Arg. Tr."). There are two other pending lawsuits involving parties to this case. In *NASDI Hldgs., LLC v. N. Am. Leasing, Inc.*, C.A. No. 10540-KSJM (Del. Ch., filed Jan. 14, 2015), the first Delaware action, Plaintiffs seek specific performance of § 3.8(b)(ii) of the Purchase Agreement allegedly entitling Plaintiffs to an accounting, specific performance of Defendants' obligations to produce certain documents, imposition of a constructive trust, and compensatory damages for various alleged breaches of contract.  On October 4, 2018, a special master found that Defendants owe Plaintiffs damages.  The Court will hear exceptions to the special master's report on May 21, 2019.  In a New York action captioned *NASDI, LLC v. Skanska Koch Inc.*, C.A. No. 1:17-cv-03578 (S.D.N.Y., filed May 12, 2017), NASDI alleges that its termination of the Bayonne Bridge Subcontract was the result of Skanska's prior breaches.  In that action, NASDI seeks damages for breach of contract and breach of the covenant of good faith and fair dealing, as well as *quantum meruit* relief.

to indemnify Plaintiffs for the 2017 Losses. Plaintiffs have also moved for summary

judgment on the Third and Fourth Affirmative Defenses—unclean hands and failure

to mitigate, respectively.

Under Court of Chancery Rule 56, summary judgment "shall be rendered

forthwith" if "there is no genuine issue as to any material fact and . . . the moving

party is entitled to judgment as a matter of law."[30] Summary judgment for a contract

interpretation "is appropriate only if the contract in question is unambiguous."[31]

"Indeed, this Court has described 'pure[] matters of contractual interpretation' as

'readily amenable to summary judgment.'"[32]

### A.    Breach of Contract

Delaware law governs Plaintiffs' breach of contract claim pursuant to the

Purchase Agreement's Delaware choice of law provision.[33] Interpreting the Purchase

Agreement under Delaware law requires the Court to enforce the contract's plain

language unless the contract is ambiguous.[34] The Court must not read ambiguity into

---

[30] Ct. Ch. R. 56(c).

[31] *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007).

[32] *Barton v. Club Ventures Invs. LLC*, 2013 WL 6072249, at *5 (Del. Ch. Nov. 7, 2013) (quoting *LaPoint v. AmerisourceBergen Corp.*, 2007 WL 1309398, at *3 (Del. Ch. May 1, 2007), *aff'd* 957 A.2d 642 (Del. 2008) (TABLE)).

[33] Purchase Agr. § 10.5.

[34] *Riverside Fund V, L.P. v. Shyamsundar*, 2015 WL 5004906, at *3 (Del. Super. Aug. 17, 2015) ("Absent any ambiguity, the Court should interpret a contract in accordance with the plain meaning of language in the document." (citing *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)); *NAMA Hldgs., LLC v. World Mkt. Ctr.*

9

a contract where none exists.[35] "[A] contract is only ambiguous when the provisions in controversy are reasonably or fairly susceptible to different interpretations or may have two or more different meanings."[36] "[A]mbiguity does not exist where the court can determine the meaning of a contract 'without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends.'"[37]

Plaintiffs argue that Section 9.2(e) of the Purchase Agreement obligates the Indemnifying Defendants to pay Great Lakes for the 2017 Losses. Section 9.2(e) indemnifies Seller and Great Lakes for "Losses . . . arising out of, or relating to or incurred in connection with the Letter of Credit . . . ." The 2017 Losses fall within this category, and likewise fit the definition of "Losses" set forth in the Purchase Agreement.[38] The Indemnifying Defendants do not dispute this.

---

*Venture, LLC*, 948 A.2d 411, 418 (Del. Ch. 2007) ("[T]he clear, literal meaning of the terms in a legally binding agreement should be given effect when those terms 'establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language.'" (quoting *Multi–Fineline Electronix, Inc. v. WBL Corp.*, 2007 WL 431050, at *6 (Del. Ch. Feb. 2, 2007) (citing *Eagle Indus.*, 702 A.2d at 1232), *aff'd*, 945 A.2d 594 (Del. 2008)).

[35] *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 288 (Del. 2001) ("[C]reating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented.").

[36] *Id.*

[37] *Id.* (quoting *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.,* 616 A.2d 1192, 1196 (Del. 1992)).

[38] Purchase Agr. § 1.1 (defining "Losses").

Instead, the Indemnifying Defendants argue that Plaintiffs' indemnification claim is barred by the "Notice of Claim" requirements of Section 9.3(a) of the Purchase Agreement. Section 9.3(a) requires that an indemnitee provide notice of a claim to the Purchaser:

> [1] within a reasonable time after such Indemnitee becomes aware of the existence of any potential Claim by such Indemnitee for Indemnification under this ARTICLE 9, [2] but in any event before the later of the Termination Date or the survival period provided in Section 9.5 with respect to particular representation or warranty to which the matter applies . . . .[39]

The above-quoted language contains two clauses. The first clause requires Plaintiffs to notice potential claims "within a reasonable time after" Plaintiffs discover the potential claim. The second clause imposes another set of deadlines: the later of the "Termination Date," defined as March 16, 2016, or the "survival period provided in Section 9.5 with respect to particular representation or warranty to which the matter applies."

The Indemnifying Defendants argue that the second clause imposes a *qualification* on the "reasonable time" requirement of the first clause. They point to a portion of the introductory phrase, "in any event," which contractual drafters use to introduce a limiting or qualifying clause.[40] If the second clause is construed as a

---

[39] *Id*. § 9.3 (emphasis and bracketed numbers added).

[40] *See, e.g.*, Kenneth A. Adams, *A Manual of Style for Contract Drafting* §§ 13.541–46 (Am. Bar Ass'n 3d ed. 2013) (explaining that "using *provided that* is an imprecise way to

11

qualification, *all* indemnification claims must be noticed before the Termination Date or, with respect to certain representations and warranties, before their respective survival periods. Plaintiffs' indemnification claims do not arise from representations and warranties. So, under the Indemnifying Defendants' reading, the relevant deadline for noticing the claims was the Termination Date, or March 16, 2016. Plaintiffs did not (and could not have) claimed the 2017 Losses in 2016 before they incurred those losses. Their claim is thus time-barred, according to the Indemnifying Defendants.

The Indemnifying Defendants' interpretation is flawed. By zeroing in on the words "in any event," the Indemnifying Defendants lose sight of the purpose of the indemnification provisions as a whole. That purpose was to indemnify Plaintiffs for seven types of "Losses" set forth in Section 9.2. The fifth type of loss, set forth in Section 9.2(e), is one "arising out of relating to or incurred in connection with" the Bonds or Letter of Credit. Plaintiffs' bonding obligations under Section 7.7 remain operative until the "Bond Covenant Termination Date," or the date when the sureties are no longer required by the underlying projects.[41] By interpreting the second clause as terminating Plaintiffs' indemnification rights relating to the Letter of Credit

---

signal the relationship between two conjoin contract provisions" and recommending use of the phrase "in any event" instead of "provided that" to impose a limitation).

[41] Purchase Agr. § 7.7(b).

12

before Plaintiffs' obligation to maintain the Letter of Credit ceases, Defendants undermine the purpose of the indemnification provisions.

Read properly, the second clause does not affect indemnification claims relating to the Letter of Credit. Rather, the second clause applies only "with respect to the representations and warranties."[42] That is, the second clause applies solely to the first type of loss set forth in Section 9.2(a)—loss arising out of a breach of a representation or warranty in the Purchase Agreement; the "reasonable time" requirement applies to the other six types of losses. This is evident from the structure of the second clause, which roughly parallels the provisions of Section 9.5 governing "Survival of Representations and Warranties." Under Section 9.5, representations and warranties remain operative until the Termination Date, with two exceptions. After the Termination Date, two sets of representations and warranties survive: (i) those set forth in Sections 4.1, 4.2, 5.1, 5.2, and 5.3, which remain operative "indefinitely"; and (ii) those set forth in Sections 4.9, 4.12, and 4.17, which remain operative for the "full period of all applicable statutes of limitations plus 60 days." The language of the second clause ties to the default (the "Termination Date") and the exceptions "the survival period provided in Section 9.5."

In sum, the purpose of the second clause is to ensure that Plaintiffs are able to notice indemnification claims relating to representations and warranties for the life

---

[42] *Id*. § 9.3(a).

of those representations and warranties, not to cut short indemnification rights relating to the Letter of Credit.

Interpreted in this manner, the second clause imposes not a *qualification on* but an *exception to* the "reasonable time" requirement. That exception applies to indemnification claims based on representations and warranties.[43] This reading is reinforced by the full introductory phrase: "***but*** in any event." In contractual drafting, "but" typically introduces an exception.[44]

For those reasons, Plaintiffs are entitled to summary judgment based on the contractual interpretation of the Purchase Agreement.

## B. Unclean Hands

Plaintiffs are entitled to summary judgment on the Indemnifying Defendants' claim that the equitable doctrine of unclean hands bars Plaintiffs' legal claim for breach of contract.

Typically, a party may not assert an equitable defense against a purely legal claim, even when the legal claim is pending in a court of equity.[45] This bar seeks to

---

[43] Pls.' Opening Br. at 16–18.

[44] Tina L. Stark, *How and Why Lawyers Do What They Do* § 21.9 at 317 (Aspen 2d ed. 2014).

[45] *See, e.g.*, *Standard Gen. L.P. v. Charney*, 2017 WL 6498063, at *25 (Del. Ch. Dec. 19, 2017) (denying defendant's attempt to invoke the doctrine of unclean hands as a defense against a breach of contract claim seeking damages because "the 'unclean hands' doctrine bars equitable, not legal, relief" (internal quotations omitted)); *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 973–83 (Del. Ch. 2016) (discussing the application of time-bar principles "that originated in equity (laches) and at law (statute of limitations)); *Lehman*

14

place litigants in the same position—no better or worse—that they would have been placed had the claims been filed in a court of law.[46] A court of law does not permit the defense of unclean hands.[47] Thus, allowing the defense in the Court of Chancery would place a defendant in a better position than if the claim had been pursued in a court of law. Delaware law does not permit that leg up.

Accordingly, Plaintiffs are entitled to summary judgment on the Third Affirmative Defense of unclean hands.

_____

*Bros. Hldgs. Inc. v. Spanish Broad. Sys., Inc.*, 2014 WL 718430, at *7 n.47 (Del. Ch. Feb. 25, 2014), *aff'd* 105 A.3d 989 (Del. 2014) (stating that the "'unclean hands' doctrine bars equitable, but not legal, relief"); *Weber v. Weber*, 2015 WL 1811228, at *4 n.20 (Del. Ch. Apr. 20, 2015) ("Generally, this Court does not apply the unclean hands doctrine in garden-variety breach of contract cases."). *See also* Dan B. Dobbs, *Law of Remedies* § 2.4(2) (2d ed. 1993) ("If the defense is really an appeal to equitable discretion, then it should apply only to bar equitable remedies.").

[46] *Lehman Brothers*, 2014 WL 718430, at *7 (refusing to apply the doctrine of laches to a breach of contact claim within the statutory limitations period, but which the plaintiff had arguably delayed in filing, reasoning that "it would make little sense for a plaintiff in the Court of Chancery . . . to be placed in a worse position than if she had filed in a Delaware court of law where laches would no bar suit"); *Kraft*, 145 A.3d at 976 (holding that the reasoning of *Lehman Brothers* "is equally sensible in the reverse: a plaintiff vindicating a purely legal action in the Court of Chancery . . . should not be placed in a potentially better position to seek to avoid a statute of limitations").

[47] For the proposition that Delaware courts of law *should* be able to consider equitable defenses, the Indemnifying Defendants cite to *USH Ventures v. Global Telesystems Group, Inc.*, 796 A.2d 7 (Del. Super. 2000). The discussion to which the Indemnifying Defendants cite, however, falls under the heading "Preliminary Digression," which contains proscriptive, "free-wheeling dicta." Elsewhere, *USH* acknowledges that "[t]he defense of 'unclean hands' is generally inappropriate for legal remedies." *Id.* at 20 n.16.

15

## C.    Failure to Mitigate

Plaintiffs are entitled to summary judgment on the Indemnifying Defendants' defense that that Plaintiffs failed to mitigate their damages. In support of this defense, the Indemnifying Defendants rely on the fact that, prior to NASDI walking off the Bayonne Bridge project, the Indemnifying Defendants presented Great Lakes with the option to fund a $5 million shortfall to complete the project, which Great Lakes declined.

The failure-to-mitigate defense fails on multiple levels. For one, the defense relies on events that occurred *before* the breach relevant to this litigation— the Indemnifying Defendants' failure to indemnify Plaintiffs. The duty to mitigate generally arises *after* a breach has occurred.[48]

Also, an injured party is "not required to 'make unreasonable personal outlays of money'" to minimize losses,[49] or take unreasonably speculative steps such as "mak[ing] another contract with the defendant who has repudiated."[50] Accordingly, Plaintiffs had no obligation to pay an additional $5 million to support the Bayonne

---

[48] *McKinley v. Casson*, 80 A.3d 618, 627 (Del. 2013) ("The duty to mitigate damages generally arises *after* a defendant has breached its duty to a plaintiff.").

[49] *Bank One, Texas, N.A. v. Taylor*, 970 F.2d 16, 29 (5th Cir. 1992) (quoting *Halliburton Oil Well Cementing Co. v. Millican*, 171 F.2d 426, 430 (5th Cir. 1948)).

[50] *Henkel Corp. v. Innovative Brands Hldgs., LLC*, 2013 WL 396245, at *4–5 (Del. Ch. Jan. 31, 2013) (citation omitted).

16

Bridge project, or make new contractual arrangements with the Indemnifying Defendants for that purpose.

## III. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is GRANTED on the First Cause of Action, the Third Affirmative Defense of unclean hands, and the Fourth Affirmative Defense of failure to mitigate.